**Vincent LEE, Petitioner,**

v.

**Sherman H. CROUSE, Warden, Kansas State Penitentiary, Lansing, Kansas, Respondent.**

**Civ. A. No. KC–2248.**

United States District Court
D. Kansas.

July 24, 1967.

---

Vincent Lee, pro se.

Robert C. Londerholm, Atty. Gen., and Richard H. Seaton, Asst. Atty. Gen., Topeka, Kan., for respondent.

## MEMORANDUM
## FINDINGS OF FACT,
## CONCLUSIONS OF LAW

WESLEY E. BROWN, District Judge.

This action was originally filed before Chief Judge Arthur J. Stanley, Jr., of this District as a habeas corpus proceeding, wherein petitioner VINCENT LEE alleged that Kansas State Penitentiary authorities were unconstitutionally prohibiting the practice and worship of the Islam religion by Negro inmates. Leave to proceed without prepayment of fees was granted. A motion for appointment of counsel was denied.

Answering, the Warden denied any constitutional violations. He stated that Lee's religion advocated segregation of the races, inferiority of the white race, and hatred of white people. Fearing potential disciplinary problems inherent in Lee's beliefs, he prohibits Lee and his fellow believers from congregating in their own assemblies, or tabernacle, and does not permit Muslim ministers to conduct religious services. He stated that Lee is permitted to receive all outside religious publications mailed to him, to discuss his beliefs with others in small and orderly groups, to attend non-sectarian services at the prison, and to confer with visiting Muslim ministers, subject to ordinary penitentiary visiting rules.

Lee filed a traverse, challenging respondent's statement of Muslim beliefs, stating, inter alia, that they advocate separation, not segregation, of the races; he denied that they are permitted to discuss religion in small, orderly groups, and claimed religious harassment and persecution in the guise of disciplinary confinement.

Lee submitted a list of 37 witnesses he desired to call, including 24 inmates, four prison officials, and five authorities of the Nation of Islam. To avoid cumulative testimony and unnecessary expense and security problems, the court ordered Lee to submit a statement of the testimony he expected from each witness. From that statement and affidavit, the court found that the inmates' testimony would be cumulative, and ordered Lee to select three inmates, and submit their names to the Clerk. Lee moved to rescind that order, which was denied. He then moved that Judge Stanley disqualify himself, which motion was granted. The action was then transferred to Wichita before the undersigned Judge.

On November 28, 1966 at a pre-trial conference Lee moved that this Judge disqualify himself. As grounds therefor, Lee stated that an appeal was pending before the Tenth Circuit Court of Appeals from an order by Judge Templar dismissing a complaint filed by Lee against Judge Stanley, Lee v. Arthur J. Stanley, Jr., No. T-4133, in which Lee claimed $100,000,000 damages for violation of his constitutional rights. Lee asserted that not only Judge Stanley, but all judges of the District were made defendants by use of the words "et al" in the caption thereof; that all of the judges had directly or indirectly committed or condoned the same offenses charged against the Warden; that they were thus "interested" in the case, and had advised counsel for the state. The court found all these grounds totally baseless and denied the motion.

The court requested two attorneys to represent Lee, Mr. Robert Beall and Mr. John Tillotson, both of the Leavenworth Bar. Mr. Tillotson visited Lee at the penitentiary prior to the pre-trial, and he rejected his assistance, on the ground that he neither could nor would adequately represent him. [Tr. 33 et seq.] Mr. Beall's representation was also declined on the basis that as Assistant County Attorney of Leavenworth County he could not properly represent Lee. His duties as Assistant County Attorney would have terminated before the pre-trial or trial. Lee rejected both attorneys on the ground, apparently, that they had prejudicial preconceptions about the merits of his case, such that neither could adequately represent him. He has maintained since that he has been denied counsel. There is no absolute right to appointment of

counsel in either habeas corpus or civil rights actions. See Ratley v. Crouse, 365 F.2d 320 (10th Cir. 1966). Lee was not denied counsel, however. The court, under 28 U.S.C. § 1915(d), requested two attorneys to represent Lee. Lee fails to appreciate that an attorney is often called upon to represent unpopular causes or persons, about the merits of which he may have strong personal reservations or doubts, and they regularly afford effective, highly meritorious representation. From even those allegations of petitioner which we can seriously credit, it appears only that Mr. Tillotson may have expressed his honest, professional opinion of the legal substance of petitioner's cause of action, an indication of professional integrity for which he is to be commended, not faulted. The court was, and remains, satisfied that either attorney could have adequately represented Lee. He is not entitled to select his counsel; having rejected two competent attorneys on nothing more than his private suspicion that they were not personally disposed toward Lee's cause, he may not claim denial of counsel even if he were entitled to demand counsel.

■ The court held that the action, in substance, was a civil action for injunctive relief, under the Civil Rights Act, 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983, and that Lee's petition would be treated as a complaint under that Act. There was no showing that Lee's complaints here had been presented to the state courts, a prerequisite to federal habeas relief, absent a showing of inadequacy or ineffectiveness of state remedies, 28 U.S.C. § 2254.

■ In addition, even if Lee's contentions of constitutionally impermissible deprivations of religious freedom, and persecution therefor, were sustained he would not be entitled to release. Lee claimed that he had been denied a jury trial. The court held under Rule 39, F.R.Civ.P., that the essentially injunctive, equitable nature of the action precluded a jury. Lee's contention that he was entitled to a jury trial under the Sixth Amendment to the Constitution is not applicable in this case. His rights to a jury trial are afforded under the Seventh Amendment to the Constitution as implemented by Rule 38, F.R.Civ.P.

■ A threshold question is the extent of our jurisdiction to inquire and grant the relief sought. In Pierce v. La-Vallee, 293 F.2d 233 (2nd Cir. 1961), the court noted that a "considerable body of authority, particularly from the Seventh and Ninth Circuits, holds that a state prisoner complaining of improper prison treatment must seek his relief in the state court. [Citations omitted.]" The court continued: "Whatever may be the view with regard to ordinary problems of prison discipline, however, we think that a charge of religious persecution falls in quite a different category." 293 F.2d at 235. The court held that complaints similar to those herein were properly entertained under the Civil Rights Act. It is true that federal courts have no supervisory power over state prisons. See Krupnick v. Crouse, 366 F.2d 851 (10th Cir. 1966). The executive province of administration of prisons is not a shield against *unwarranted* deprivations of constitutional rights, however. The complaint construed in a most liberal manner states a cause of action, which we should not decline to entertain. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). (For a review of cases dealing with Provisions of Religious Facilities for Prisoners, see 12 A.L.R.3d 1276).

The parties to this action require some description for a proper understanding of the views expressed herein.

Lee is currently an inmate of the Kansas State Penitentiary. He was charged and found guilty by a jury on three counts of robbery in the first degree. The convictions were affirmed (State v. Lee, 197 Kan. 463, 419 P.2d 927, 1966). He was raised in St. Louis where he encountered racial prejudice. He entered the Army at a young age, was sent to

Europe. He was court-martialled and spent considerable time in various federal prisons, before being incarcerated at Lansing. He first learned of the Black Muslim movement while in the federal prisons. During the time between his federal and state incarceration he became a registered Black Muslim, was given the name of Vincent 2X, and continued his study of its concepts. He has also studied law in courses from LaSalle Extension University. He has used this "legal education" and filed numerous habeas petitions and damage suits against public officials. He was not considered by prison officials at the time of these hearings as a disciplinary problem.

The Warden is a career officer, in charge of Kansas State Penitentiary. The penitentiary is a maximum security institution for adult offenders. He is responsible for the institution, its properties, operation and monies for its operation. He has the responsibility for the welfare of the inmates, including housing, food, clothing, and their physical well-being. His duties include an effort to see that inmates are returned to civilian population better suited to meet the duties of citizenship than when they were incarcerated at the penitentiary.

The prison has a population of between 1500 to 1600 inmates, approximately 25% of whom are Negro. Two-thirds of this prison population are not native Kansans. The Warden with approximately 192 civilian employees is required to carry out prison policy. (See K.S.A. 76–2404—Powers and Duties of the Director of Penal Institutions).

This prison policy as related to the Black Muslims may be summarized thus:

1. There is no policy to control or inhibit any individual prisoner's beliefs, religious or otherwise.

2. The Black Muslims, because of both their teachings of supremacy of one race over another and separation of races and their efforts to establish a separate nation, are not considered a religious body to be guaranteed constitutional privileges and immunities and rights of a religion.

3. The policy prohibits those who profess to be Black Muslims from assemblage together, holding meetings, proselytizing that faith in large groups, or having ministerial representatives of that faith conduct services.[1]

We point out hereafter that the Warden gave a liberal construction of this policy in dealing with the two or three known inmates professing to be Black Muslims.

Certain terms must be defined: We use the term "Black Muslim" to mean "The nation of Islam in North America headed by the Honorable Elijah Muhammad," "The Muslim sect or cult," and "Muslim."

We use the term "Islam" and "Moslem" to refer to one of the world religions which include Hinduism, Chinism, Buddhism, Shintoism, Confucianism, Islam, Judaism and Christianity.

The "Koran" and "Qu-ran" are different spellings of the same work, the revelations to Mohammad.

We find some of the basic difference between the Black Muslims and the Mos-

---

1. The Director of Penal Institutions testified in part:

"* * * Our policy, which prohibits those who profess to be members of the Black Muslim sect, prohibits them from assemblage together, holding meetings, proselytizing of that faith, or having in attendance alleged ministerial representatives of that faith, is based upon our understanding of the Black Muslim sect and the inherent pitfalls and potential danger inherent in those preachings. Regardless of whether it is judicially determined to be a religion or not the same pitfalls and inherent dangers exist therein as long as anyone espouses those principles, so it is based upon a collective understanding of those precepts as we believe members of the faith profess to hold them, and it is most certainly not on an individual basis or because of one who claims to be a member that we have prohibited it. If the Warden professed to be a Black Muslim, I wouldn't let him meet with him." [Tr. pp. 882–3]

lems to be as follows: The fundamental Moslem teaching is the brotherhood of all men without reference to color, race, and nationality. The Black Muslims take a racist position of solidarity of the black people against the white with supremacy of the black people over the white and advocate separation of the white and black races.

The Black Muslims believe that Elijah Muhammad is a messenger of Allah. This is contrary to the fundamental Moslem teaching that revelation moved to a climax and concluded with the prophecies of Mohammad as revealed in the Koran. The Moslem concept of religious practice is based upon the individual's immediate access to God or Allah with no need for any individual or intermediary to stand between man and God. There is no priestly order in Islam.

The Black Muslims have public and private meetings. The white man cannot be a Black Muslim nor can he attend their private meetings.

The Moslem belief of the origin of man is the same as the Hebrew and Christian tradition, whereas the Black Muslims believe that the original man was black and the white man was conceived by the black man as a result of a special method of birth control law.

Other teachings of Elijah Muhammad conflict with our constitutional concept of the rights and duties of citizenship. The Black Muslim sect is a militant, highly disciplined group, whose fundamental teaching is Negro fraternity and solidarity. The Black Muslims encourage the study of so-called Negro history; the establishment of independent Negro social and economic institutions; and propose ultimate separation of the races and establishment of a separate Negro territorial state. This positive program has a serious negative aspect, for its appeal is augmented by statements, of varying vehemence, condemning and rejecting so-called "white" social, economic, religious, and political institutions; past white exploitation, both real or imagined, of the Negro people; and ulti-

mately, the white race itself. Black Muslim interpretations of the Moslem religion extract virulent denunciations of the white race from Biblical texts, and forecast a final holy war, an Armageddon, where the moral and theological superiority of the Negro race will be vindicated by the judgment of Allah. (See *Black Muslims in America* by C. Eric Lincoln, and The Supreme Wisdom by Honorable Elijah Muhammad).

In our view, characterization of the Black Muslims as a religious body depends in part on their effort to use the Moslem tradition as a vehicle to carry out their secular and political teachings. The Black Muslims do claim historical antecedents in the Moslem faith, although the latter faith denies the validity of those claims.

■ In United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302 (1931), Chief Justice Hughes wrote, "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." In United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), the Court construed the statutory definition of religion in the Universal Military Training and Service Act, at 50 U.S.C.App. § 456(j), "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but [not including] essentially political, sociological, or philosophical views or a merely personal moral code." The Court traced the "ever-broadening understanding of the modern religious community," and announced "essentially an objective" test to identify a religious belief, under the statute: "[D]oes the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?" 380 U.S. at 184, 85 S.Ct. at 863, 13 L.Ed.2d at 747. It is clear from the testimony of the inmate witness Young, identified also as Arnold X., and Lee himself, both registered members of the Black Muslim sect and intimately familiar as laymen with its

beliefs, that the Muslim beliefs meet the *Seeger* test, which, though based partly on statutory interpretation, seems equally appropriate here. Further, although the Black Muslim movement advocates a substantial, highly controversial political program, and its appeal rests importantly on racist and other than purely religious considerations, it does have religious characteristics, including a deity, a theological view of man and history, derivative moral values, and emphasis on religious observances. We hold that the Black Muslim sect or cult insofar as it follows Islamic teachings of the Koran constitutes a religious body, whose religious beliefs, as opposed to its purely activist secular and political aspects, may be considered a religion. See Note, 75 Harv.L.Rev. 837 (1962).

We next treat Lee's allegations of harrassment and persecution of Negro inmates solely because of their interest in or adherence to the Muslim sect.

 Lee in his traverse stated that he himself had been falsely charged with violating institutional rules three times, and has been given periods of restrictive confinement (called "long-lock"—confinement to one cell, loss of recreational, educational and other privileges). Captain Earls, captain of the guards and in charge of security, testified concerning Lee's disciplinary record, stating at least three separate charges against Lee: 1) Dec. 5, 1964—"skating" (found in unauthorized area), and lying to an officer; 2) Dec. 21, 1964—possession of unauthorized material in his cell; 3) April 4, 1965—(the one date specified by Lee is his traverse) lying to an officer. Lee inquired of many witnesses as to his disciplinary record, to make the point that as a Muslim devotee, he has not been a problem to the prison administration. There was general agreement that his record was "good," "better than average," and that he had presented no problems. The charged infractions all were justified; Captain Earls himself drew up one or more of them; they warrant no inference of persecution or harassment for religious reasons.

Lee also alleged persecutory treatment of other Negro inmates. In his written summary of what he expected his requested inmate witnesses to testify to, he made sweeping allegations that both officers and inmates under the influence of narcotics roamed the penitentiary, creating racial tension and discord, and committing brutal inhumane physical assaults upon Black Muslims. He further alleged stabbings and murders of both Negro and white inmates for racial, religious, monetary and other reasons, by other convicts under the influence of drugs and narcotics, all encouraged and condoned by prison officials. We find that these claims are utterly unsubstantiated, and that plaintiff's credibility and the integrity of his representations to the court are drawn seriously in question. Only two instances of violence were testified to, involving Laville Lacy Hannon and Maxell Potts, both Negroes. Captain Earls testified in detail concerning the Potts incident—that when an officer opened his cell, Potts emerged, said "good morning," and suddenly struck the guard. Hannon admitted that he struck the officer for attempting to remove contraband literature from his cell. There was no evidence that excessive force was used to overcome these attacks. Lee referred repeatedly in leading questions to his witnesses to a prison guard arrested inside the prison with a quantity of narcotics on his person. There was no evidence whatever to relate that alleged incident to his allegations herein.

The institutional policy governing Muslim religious services and individual rights are largely undisputed. The policy was implemented to give individual religious latitude. Muslim ministers are permitted to meet with inmates only under ordinary visitors' rules. They were not allowed to conduct worship services nor address groups of Negro inmates. Lee denied that Negro inmates were permitted to discuss their Muslim beliefs in small orderly groups. The Warden showed that groups of four to six persons were permitted to gather and dis-

cuss Muslin beliefs and doctrines. Doubtless such groups may be closely watched by prison guards fearful of sudden unexpected outbreaks, and concerned for their own safety; such surveillance does not constitute persecution or harrassment. Lee need not resent such vigilance by prison officials. The Warden showed that all religious publications received for inmates were delivered to them.

Lee states that when he arrived at the penitentiary the Warden summoned him, along with other Negro inmates, to his office and stated that he would tolerate no gathering by Lee at any time, and that any reported gathering would result in disciplinary action for all concerned. The Warden testified that a meeting was held in 1964, shortly after Lee's arrival at the prison; that prior to that time there had been discontent among the Negro inmate population, and that the meeting was intended to permit them to air their grievances; that he asked the Deputy Warden to assemble a cross-section of Negro inmates, and that Lee, then in post-admission quarantine, happened to be among them. He recalled no discussion of the Black Muslim religion. Captain Earls testified only that Lee did ask to receive religious literature in the prison.

The Warden testified further that Lee was permitted to proselytize. Young corroborated this testimony. We find that Lee's claim that essentially individual, personal religious activity, extending to groups of not more than six persons was denied by prison officials, was not supported by substantial evidence; that Lee was permitted to conduct proselytizing activities; that the restriction on the size of a Negro gathering was not imposed for discriminatory religious reasons, but rather that it was general limitation on the size of any group of inmates, other than for athletic, recreational, or other known purposes for valid security reasons.

In the Warden's considered judgment, group assemblies of Negro inmates conducted by Muslim ministers may poten-

tially create racial tension and hostility which may unpredictably burst into violence. The unrest and violence caused at other penitentiaries is described in Sostre v. McGinnes, 334 F.2d 906 (2nd Cir. 1964), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96, 85 S.Ct. 168, and cases cited therein.

■ The Warden may proscribe Black Muslim congregations and activities within the institution on the ground that the racial antipathy implicit in their teachings may create racial tension and inflammatory hostility among the population of over 1500 inmates, one-fourth of which is Negro. He stated that his judgment has been supported by other wardens and personnel involved in the management of other correctional institutions. Two inmates testified that, in their opinion, dangerous situations could result if Muslim principles were given broader circulation, or if it acquired spokesmen other than plaintiff. The record and cases support the Warden's conclusion (12 A.L.R.3d 1276, et seq.).

Young (Arnold X) testified at length concerning his beliefs, and gave a statement of their doctrinal tenets. He stated he had never seen a Muslim congregation "worked up," and that the racial principles could be taught without creating hostility. The psychological impetus and momentum given anti-white sentiments by organized, group instruction and worship is highly unpredictable, however. The dangers of group assemblies of Muslim inmates has been already demonstrated at the federal penitentiary in Leavenworth. See Jones v. Willingham, 248 F.Supp. 791 (D.Kan. 1965) (Stanley, C. J.).

■ In our view, the Warden has admirably balanced delicate, competing considerations, the right of inmates to follow the dictates of their faith as against the imperative necessities of discipline and order. As stated in Sostre v. McGinnes, supra, "the nub of this whole situation is not to be found in the existence of theoretical rights, but in the very practical limitations on those rights

which are made necessary by the requirements of prison discipline." It is not our province to promulgate rules and regulations to govern the practices of religion in the state prisons. We are convinced, and so hold, that Lee's rights to religious expression have been accommodated to the greatest extent possible consistent with the requirements of prison discipline and security; that he has not been harrassed or persecuted because of his religious views and that the Warden has properly exercised his power and duty in the conduct of the prison.

The Clerk will enter judgment for Sherman H. Crouse, Warden, in accordance with Rule 58 of F.R.Civ.P.