[Crim. No. 14871. In Bank. Oct. 18, 1971.]

In re JOHN VAN GELDERN on Habeas Corpus.

[Crim. No. 14939. In Bank. Oct. 18, 1971.]

In re NATHAN E. ELI on Habeas Corpus.

## COUNSEL

John van Geldern, in pro. per., and R. Jay Engel, under appointment by the Supreme Court, for Petitioner in No. 14871.

Paul N. Halvonik and Charles C. Marson as Amici Curiae on behalf of Petitioner in No. 14871.

Nathan E. Eli, in pro. per., Roger S. Hanson, Paul N. Halvonik and Charles C. Marson for Petitioner in No. 14939.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Derald E. Granberg, John T. Murphy and George R. Nock, Deputy Attorneys General, for Respondent.

## OPINION

**PETERS, J.**—Petitioners Nathan E. Eli, an inmate at San Quentin Prison under sentence of death, and John van Geldern, an inmate at Folsom State Prison, seek habeas corpus to challenge a Department of Corrections rule requiring inmate-authors to relinquish a portion of their profits and royalties from published writings.

That rule, Director of the Department of Corrections rule 2505, provides: "To defray handling costs, a percentage established by the Director will be deducted from the payment received for each manuscript and deposited in the Inmate Welfare Fund. The percentage will be the same as that established for paintings [25%]. Prior to the submission of a manu-

script for publication, the inmate will sign an agreement authorizing such deduction."

The "handling costs" for which the 25 percent is deducted arise from the already compensated time and effort required of prison administrators in the processing of manuscripts. Each manuscript, before it is sent out, must according to prison rules be reviewed by staff members for obscenity or matter of a character tending to incite violence or gambling.[1] Controversial manuscripts may require review at higher levels. If the prisoner is successful in getting his manuscript published there is also the expense and time involved in placing the money in the trust account, recording it in the books (and, presumably, transferring the disputed 25 percent to the inmate welfare fund).[2] Since some of the manuscripts prison authorities must review are rejected by publishers, the Attorney General suggests that successful prison authors are, in effect, partially "subsidizing" the less talented or fortunate would-be writers.

All costs of the production of manuscripts are borne by the inmate-authors themselves. The paper, carbon paper, second sheets, envelopes and other material they use must be purchased with their own funds from the canteen. Nor does the state furnish typewriters and ribbons; these too are acquired by the inmates at their own expense. Finally, the inmate must seek his own publishers with no assistance from the prison authorities and, once found, must pay the postage necessary to get the manuscript to the publisher.

Although the justification stated for the rule is that the 25 percent handling fee is necessary to "defray handling costs," the rule itself reveals that it is not actually used for this purpose. Rather, the funds are "donated" by the prison authorities to the inmate welfare fund.

---

[1] These restrictions on manuscripts are found in the Department of Corrections Library Rules and are based on section 313 of the Penal Code, which defines and outlaws "harmful" or obscene materials, and section 2600, subdivision (4) of the Penal Code, which prohibits the *receipt* by prisoners of materials suffering the above mentioned defects but contains no such restrictions on manuscripts written by prisoners to be sent out of the prison for publication.

[2] The Attorney General claims an additional administrative expense in restoring civil rights so that the inmate-writer can enter into a contract. He cites section 2600 of the Penal Code which states that a prison sentence in state prison suspends all civil rights but that the Adult Authority may restore such civil rights as it deems proper. Section 2603 of that code, however, states that nothing in the three preceding sections (which include § 2600) should be construed to render inmates "incapable of making and acknowledging, a sale or conveyance of property." Section 2600, subdivision (3), states that prisoners own all written materials produced by them in prison, thus recognizing that the manuscript is "property." Thus to the extent the inmate-author enters into a contract for the sale of property, it is unnecessary to obtain the restoration of the civil right to enter into contracts.

The fund was established by section 5006 of the Penal Code[3] as a trust fund to "be used for the benefit, education, and welfare of inmates of prisons and institutions under the jurisdiction of the Department of Corrections, . . ." Fund moneys are used for such services and programs as the prison canteen, handicraft programs, blood services, purchase and maintenance of television sets, purchase of phonograph records, games and athletic equipment, and the operation of the inmate newspapers and institution libraries. None of the fund moneys appear to be expended in aid of the efforts of budding inmate-authors.

Operating funds from the inmate welfare fund are derived from profits from canteen sales, a 10 percent handling charge on the purchase of materials used for making handicrafted articles, a 25 percent charge on the sale of art works, and the 25 percent charge on publishing royalties here in question.

■ We have, in this state, "long since abandoned the medieval concept of strict 'civil death' and have replaced it with statutory provisions seeking to insure that the civil rights of those convicted of crime be limited only in accordance with legitimate penal objectives." (*In re Harrell*, 2 Cal.3d 675, 702 [87 Cal.Rptr. 504, 470 P.2d 640].) To that end, the Legislature, in 1968, amended the "Civil Death" statute, section 2600, to provide that certain basic rights be retained by prisoners. One of these is the right "[t]o own all written material produced by such person during the period of imprisonment." This property right was created in the context of another and preexisting right retained by prisoners, the right to make and acknowledge the sale or conveyance of property. (§ 2603.)

■ Thus it is clear that a prisoner has the right both to own and to sell his manuscripts. The question presented by the instant case is to what extent the prison may infringe the prisoner's right to own and secure publication of his writings without violating section 2600, subdivision (3) and section 2603.

■ The powers of the Director of Corrections are broad but not unlimited. ■ The civil rights set forth in section 2600 are fundamental guarantees which may not arbitrarily be infringed. (*In re Harrell, supra,* 2 Cal.3d 675, 698.) ■ Nor may the director promulgate arbitrary or unreasonable regulations. (*In re Ferguson* (1961) 55 Cal.2d 663, 671-672 [12 Cal.Rptr. 753, 361 P.2d 417]; see also *In re Chessman* (1955) 44 Cal.2d 1, 9 [279 P.2d 24]; *Davis* v. *Superior Court,* 175 Cal.App.2d 8, 20 [345 P.2d 513].) ■ Nonetheless, section 2600 cannot, in the words

---

[3]Unless otherwise indicated, all section references are to the Penal Code.

of *Harrell,* "be construed as a straightjacket limiting the ability of the prison authorities to deal with institutional realities." (*In re Harrell, supra,* 2 Cal. 3d 675, 698.) ■ Valid and compelling institutional considerations may necessitate certain limited inroads upon the exercise of the prisoner's civil rights.

No compelling institutional considerations appear in this case. Rule 2505 itself states the sole justification of the 25 percent assessment. The assessment, it says, is deducted to "defray handling costs." This may well constitute a reasonable justification were it actually the basis for the rule.

However, no correlation between the amount of the assessment and the expense of reviewing manuscripts has been established or even suggested. ■ If the reason for a prison surcharge is to defray costs, it must have some correlation to those costs or it is arbitrary and impermissible. The Attorney General has made no showing whatsoever of any relationship between the prison administration's handling costs and the 25 percent assessment.

We next turn to the question whether the assessment can be justified on the ground that the purpose of the 25 percent charge is not to defray prison expenses but to provide a source of support for the inmate welfare fund.

The fund itself as noted above provides no special benefits to inmate-authors. Certain other activities for which inmates must contribute to the fund are benefited by fund moneys. Inmates engaged in handicrafts must pay a 10 percent surcharge on the purchase of materials, and the inmate welfare fund contributes to the operation of the handicraft shop including certain supplies and pays wages and benefits to the personnel in charge of the arts and crafts program. When inmate craftsmen lack sufficient funds to purchase materials they may obtain loans from the fund. (§ 2877.) These services benefit inmate-artists in a similar fashion. Moreover, the prison provides for fairs and exhibitions within the walls where prisoner arts and crafts may be sold to the public. Inmate writers receive none of these benefits, but bear both the burden of the cost of producing their manuscripts and finding their own publishers.

It should also be pointed out that section 2877 specifically provides that "all *or a part* of the sale price" of inmate-produced handicrafts may be placed in the prisoner's account, thereby authorizing part of the proceeds to be withheld by the prison. There is no such authorization contained in section 2600 with respect to inmate manuscripts. ■ Unlike prisoner ownership of paintings or handicrafts, ownership of manuscripts was specifically singled out by the Legislature and, without qualification, made a civil right. The Legislature thus manifested its intent that this particular

fruit of inmate creativity be solicitously protected and held free from unnecessary restriction.

■ In light of the ownership right set forth in section 2600, subdivision (3), the inmate-author may not be taxed to support a fund from which he receives the same benefits as nonauthor inmates. The arbitrary nature of the assessment is particularly cruel in petitioner Eli's case, since he may be required to make a substantial contribution to the fund even though, as a death-row prisoner, he receives far fewer general benefits from the fund than inmates on the "main line."

As pointed out above, section 2600, subdivision (3), unequivocally states that ownership of his manuscript is an inmate's civil right, and section 2603 preserves an inmate's right to convey property. These rights mean little if inmates must relinquish, in the absence of necessity or furtherance of penal objectives, one-fourth of the value of their creative efforts. Unless the prison is required to show some basis for the figure and some legitimate purpose which it serves, there is nothing to prevent assessments of 40, 50 or even 70 percent in the name of "defraying costs." Such wholly arbitrary assessments directly diminish the prisoner's property right and, in fact, come dangerously close to being a forfeiture of prisoner's property prohibited by section 2604.■ Rule 2505 conflicts with section 2600, subdivision (3) and section 2603, and must therefore be declared a nullity.[5]

Let the writ issue directing respondent to cease enforcing rule 2505 of the Department of Corrections. Petitioners are not entitled to their release. The orders to show cause heretofore issued are discharged.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would deny the writ.

[4]A 10 percent surcharge earmarked for the inmate welfare fund on the purchase price of soft-cover books was upheld in *In re van Geldern* (1971) 14 Cal.App.3d 838, 844-845 [92 Cal.Rptr. 592]. We express no opinion as to the validity of the surcharge approved there since the opinion does not reveal whether the charge had a valid institutional justification. If, for example, soft-cover books are ordered through the canteen, which is a service provided through the inmate welfare fund, the charge may well be justified.

[5]In view of this conclusion, it is unnecessary to consider whether rule 2505 violates the inmates' constitutional right of free expression under the First Amendment.