[Crim. No. 30154. Second Dist., Div. Five. Jan. 20, 1978.]

In re VICTOR M. SERNA et al., on Habeas Corpus.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., and Steven H. Kaufmann, Deputy Attorneys General, for Appellants.

Cynthia K. Cohan, under appointment by the Court of Appeal, for Respondents.

## OPINION

**KAUS, P. J.**—Habeas corpus proceeding. The superintendent and associate superintendent at the California Men's Colony appeal from portions of a trial court order granting relief sought by petitioners Serna and Phillips, prisoners at the colony.

### FACTS

Petitioners are the pastor and assistant pastor in the Church of the C.O.N.V.I.C.T. Ministers, Universal Life Church, Charter Number 14588. An application to the prison administration for permission to expand the activities of their group included a proposal for a bank account to be established outside the prison. The money would be in the nature of religious donations and under the trust of the group's outside secretary-treasurer, who lives in Morro Bay. The prison's assistant superintendent and superintendent denied petitioners' request to send money to the church's outside bank account, and also denied petitioners' request for recognition of their organization.

The Department of Corrections provides an inmate appeals system, which includes a third—and final—level appeal to the Director of

Corrections, who must respond within 20 working days. (Department of Corrections Administrative Manual [Manual], §§ 110.06, 110.12, 110.16.) Petitioners did not appeal the denial of their requests by the superintendent to the director. Instead, they filed a petition for writ of "mandamus"—treated as a petition for writ of habeas corpus—in the superior court.

Petitioners claimed that they were being unconstitutionally denied the right to hold meetings, to display their church flag, and—the only issue involved in this appeal—to send money to their outside church bank account. The trial court ordered the superintendent to permit petitioners to conduct religious services, denied the petition with respect to the flag for failure to exhaust administrative remedies, and granted the petition with respect to donations, ordering the superintendent "to allow donations" in accordance with provisions in the director's rules concerning prisoner contributions to outside charities.

The Manual, in the section on inmate advisory and activity groups, provides that no "inmate activity group may have an outside bank account, . . ." (§ 323.17(c).) The Rules of the Director of Corrections (Cal. Admin. Code, tit. 15, § 3000 et seq.—Rules) permit prison superintendents to authorize "up to three campaigns for generally recognized charitable causes, annually" (Rules, § 3240) and, if a prisoner asks permission to make a donation, conditions approval on various factors, not challenged herein, such as that the prisoner has not been coerced, is not incompetent, and will not unduly deplete his funds. (Rules, § 3241.)[1]

The effect of the trial court's ruling is that petitioners may transfer funds to their own outside bank account as if it were a "generally recognized charitable cause" the assets of which are presumably not under the control of prison inmates.

DISCUSSION

Petitioners' theory in the trial court was that appellants' refusal to permit petitioners to maintain an outside bank account constituted an impermissible infringement of their religious beliefs and practices.

---

[1]Since this case was argued, the Manual has been revised, and paragraph section 323.17(c) deleted. The parties agree—although for different reasons—that the prohibition in the Manual against outside bank accounts remains. In October 1977, the director issued an administrative bulletin stating that inmate "joint or group investments or outside accounts are prohibited."

█ Appellants raise various contentions concerning the outside bank accounts. Only one need concern us: The trial court erred in granting relief because petitioners failed to exhaust their administrative remedies. We reverse the judgment, and direct the superior court to dismiss the petition.

█ The well established doctrine of exhaustion of administrative remedies applies to grievances lodged by prisoners (*In re Muszalski* (1975) 52 Cal.App.3d 500, 503, 508 [125 Cal.Rptr. 286]; *In re Thompson* (1975) 52 Cal.App.3d 780, 783-784 [125 Cal.Rptr. 261]), even when the grievances involve an alleged constitutional violation. (*In re Thompson, supra,* 52 Cal.App.3d at p. 783.)[2]

█ Nothing in the record suggests that resort to petitioners' administrative remedies would have been futile. Petitioners were entitled, as stated, to appeal the denial by the superintendent directly to the director of the department. (Manual, § 110.06) and to obtain a ruling within 20 days (Manual, § 110.16). █ A court "cannot presume" that an administrator "having adopted a particular rule or policy in like cases in the past, would necessarily have applied the same rule" in the next case. (*Gantner & Mattern Co.* v. *California E. Com.* (1941) 17 Cal.2d 314, 318 [109 P.2d 932].) █ In this case, although prison regulations forbid an "inmate activity group" to maintain an outside bank account (*ante,* fn. 1) neither the court nor petitioners know whether the director would apply a different standard if he found that the refusal to permit petitioners to maintain a bank account would unduly infringe on their freedom of religion.

Finally, nothing in the record suggests that to require petitioners to exhaust their administrative remedies would result in "irreparable injury." █ The exhaustion doctrine applies to claims alleging an infringement on religious beliefs or practices (*Waddell* v. *Alldredge* (3d Cir. 1973) 480 F.2d 1078, 1079) even where the infringement is direct, immediate and, if not prevented, irremediable (*Jihaad* v. *Carlson* (E.D.Mich. 1976) 410 F.Supp. 1132, 1134 [requirement that a Black Muslim shave contrary to religion]), and has been applied to situations in which the impact on the prisoner may be far more overwhelming than

[2]In pointing out that even claims of constitutional proportions require exhaustion of a prisoner's administrative remedies, we do not imply that on this record the maintenance of an outside bank account "can be made a religious rite and by the zeal of the practitioners swept into the First Amendment." (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 109 [87 L.Ed. 1292, 1296, 63 S.Ct. 870, 891, 146 A.L.R. 81].)

the right to open an outside bank account. (*In re Muszalski, supra,* 52 Cal.App.3d 500 [records for parole consideration]; *United States* ex rel. *Sanders* v. *Arnold* (3d Cir. 1976) 535 F.2d 848, 851 [parole revocation]; *Jones* v. *Carlson* (5th Cir. 1974) 495 F.2d 209, 210 [litigation correspondence].)

Reversed.

Ashby, J., concurred.

**STEPHENS, J.**—I dissent.

The admirable brevity of the statement of facts as contained in the majority opinion, while adequate for the limited analysis of the single issue therein considered, is inadequate in disposing of each of the issues raised on appeal. Necessarily then the dissent rephrases the facts and issues.

Victor M. Serna and Michael S. Phillips are pastor and assistant pastor of the Church of the C.O.N.V.I.C.T.[1] Ministers (Church), an inmate religious group at the California Men's Colony whose activities include a program of social rehabilitation for young people who might otherwise turn to crime. In order to expand the Church's religious program, Serna and Phillips asked the prison administrators for, among other things, permission to conduct religious services and make donations to an outside bank account set up to receive funds raised for the Church's youth rehabilitation program. After their request was denied by the local prison authorities, Serna and Phillips, proceeding in propria persona, petitioned the Superior Court of San Luis Obispo County for relief, alleging infringement of their constitutional right to the free exercise of religion. Although characterized by Serna and Phillips as a petition for a writ of mandamus, their request for relief was construed by the superior court as a petition for writ of habeas corpus.

Following an evidentiary hearing, the Hon. Harry E. Woolpert granted the petitioners a substantial portion of the relief sought, ordering

---

[1]*Convicts Offering Needed Voices In Constructive Thinking*

the Men's Colony to: (a) provide the Church with facilities necessary for conducting their religious services and (b) permit the Church members to make donations to the outside bank account. At the same time, the judge declined to order return of a Church flag due to the inmates' failure to exhaust their administrative remedies and refused an order stopping alleged interference with Church members' mail due to a failure of proof on that issue.

The Attorney General now appeals from that portion of the superior court's order permitting donations to an outside bank account. As set forth below in detail, I would find that the superior court committed no error in issuing that order.

Faced at the outset is the question raised by appellants of whether the superior court properly took jurisidction of this action even though respondents had not exhausted their administrative remedies.

### 1. Exhaustion of Administrative Remedies

Appellants contend that the trial court erred in granting habeas corpus relief because the respondents failed to exhaust their administrative remedies.

The requirement that one exhaust a well-defined system of administrative remedies before turning to the court for relief is a settled legal doctrine. (*McKart* v. *United States* (1969) 395 U.S. 185, 193-195 [23 L.Ed.2d 194, 202-204, 89 S.Ct. 1657]; *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 291-296 [109 P.2d 942, 132 A.L.R. 715]; *In re Muszalski* (1975) 52 Cal.App.3d 500, 503 [125 Cal.Rptr. 286].) Indeed, a court that hears a cause which is prematurely withdrawn from an administrative appeals procedure is considered to be without jurisdiction. (*Hesperia Land Development Co.* v. *Superior Court* (1960) 184 Cal.App.2d 865, 876 [7 Cal.Rptr. 815].) Adherence to the exhaustion principle insures deference to the expertise and discretion of administrative agencies and forestalls a deluge of untimely petitions to an often overburdened judiciary. (*McKart* v. *United States, supra,* 395 U.S. 185.) In the instant case, for example, appellants rightly point out that the appeals procedure of the Department of Corrections provides administrative remedies which must normally be exhausted before habeas corpus relief is sought from the superior court. (*In re Muszalski, supra,* at p. 508 of 52 Cal.App.3d 508.)

However, the requirement of exhaustion has not hardened into inflexibility. (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761].) The rule is frequently waived where the administrative procedure is not well-defined (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 168 [65 Cal.Rptr. 297, 436 P.2d 297]), where the administrative remedy is inadequate (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 342-343 [124 Cal.Rptr. 513, 540 P.2d 609]), or futile (*Gantner & Mattern Co.* v. *California E. Com.* (1941) 17 Cal.2d 314, 318 [109 P.2d 932]), or where there is a threat of irreparable injury (*Abelleira* v. *District Court of Appeal, supra,* at pp. 296-297 of 17 Cal.2d; *Ogo Associates* v. *City of Torrance, supra,* 37 Cal.App.3d 830; *Walker* v. *Munro* (1960) 178 Cal.App.2d 67, 72-73 [2 Cal.Rptr. 737]; *Hesperia Land Development Co.* v. *Superior Court, supra,* 184 Cal.App.2d 865, 876; *Greenblatt* v. *Munro* (1958) 161 Cal.App.2d 596, 605-607 [326 P.2d 929]; *Chapman* v. *Division of Real Estate* (1957) 153 Cal.App.2d 421, 431 [314 P.2d 773]; *United Insurance Co.* v. *Maloney* (1954) 127 Cal.App.2d 155, 158 [273 P.2d 579]; *Mortgage Finance Corp.* v. *Watson* (1951) 104 Cal.App.2d 640, 641 [232 P.2d 54]). In the instant case, respondents claim that irreparable injury to their fundamental rights, the constitutional nature of their claims, and the futility of further appeals within the Department of Corrections all justify a waiver of the exhaustion rule. However, inasmuch as I would conclude that the superior court's decision to take jurisdiction in this case is supported by the irreparable injury exception to the exhaustion rule, there is no need to discuss the other exceptions raised by respondents.

Before approaching the superior court, respondents sought permission for expansion of their religious program from the associate superintendent of the Men's Colony who, in turn, consulted the superintendent before denying the request. Appellants argue that respondents should then have completed their process by filing an appeal with the state Director of Corrections in Sacramento.[2] Respondents, however, argue that, given the serious curtailment of religious freedom caused by the prison's ban on their donations to an outside account, irreparable injury would result from any further procedural delay.[3]

---

[2]Appellants indicate that a director's review is the last step in the appeals process. Although not clearly stated in the administrative manual used at the time of the lower court's decision, this conclusion is corroborated by the new manual which states that: "The director's decision is final and exhausts all administrative remedies available in the Department of Corrections." (Admin. Manual of the Dept. of Corrections (1977) ch. 7300, § 7304.)

[3]Though raised on appeal, irreparable injury was not specifically pleaded by the respondents in their *pro se* petition to the superior court. However, such petitions should

Respondents' allegation of irreparable injury involves a delicate factual determination based on careful evaluation of the evidence presented to the lower court. Therefore, whether the claim of irreparable injury is meritorious depends on the findings made by the superior court.

First to be noted is the fact that Judge Woolpert denied a portion of the relief sought by the respondents "for failure to exhaust administrative remedies." This is a clear indication that the requirement of exhaustion was very much in the trial judge's mind as he weighed respondents' petition for a writ of habeas corpus. Indeed, in an earlier order denying respondents an injunction and restraining order, Judge Woolpert noted that the court "generally does not interfere with prison custodial matters, unless the facts warrant intervention." Thus, the fact that the judge went on to grant respondents both religious services and the right to make outside donations reflects his conclusion that those aspects of respondents' petition were too important to the free exercise of respondents' religion to allow the court's abstention on the grounds of failure to exhaust administrative remedies. The question is whether this conclusion constitutes a finding of irreparable injury.[4] I believe that it does.

Appellants' reply brief cites *Humbert* v. *Castro Valley County Fire Protection Dist.* (1963) 214 Cal.App.2d 1, 6 [29 Cal.Rptr. 158], for the proposition that the irreparable injury exception applies "only to cases 'dealing with rate orders of regulatory commissions, where the administrative body imposes a confiscatory rate on a public utility.'" This argument is unpersuasive. *Humbert* stands alone in so severely limiting

be liberally construed (see *Haines* v. *Kerner* (1972) 404 U.S. 519, 520-521 [30 L.Ed.2d 652, 653-654, 92 S.Ct. 594]) and, as explained hereinafter, the concept of irreparable injury is broad enough to include the type of harm described in respondents' petition. I therefore consider the issue of irreparable injury to have been properly raised in the court below, believing that the constitutional right to worship in one's own way, not trespassing upon the rights of others, is irreparably injured when banned by fiat.

[4]Appellants claim that this factual judgment by the lower court was in error. Reconsideration of this claim would, however, involve relitigating issues of fact already decided by the trier of fact. This should be avoided. Absent anything in the record to the contrary, it must be presumed that the superior court committed no error in reaching its conclusions of fact. (*People* v. *Clifton* (1969) 270 Cal.App.2d 860, 862 [76 Cal.Rptr. 193].) In this regard, it is also significant that the respondents' petition was recharacterized by the lower court as one seeking a writ of habeas corpus rather than a writ of mandate, thus further indicating the serious infringement of liberty which the lower court believed to have occurred. (See Pen. Code, § 1473 as compared with Code Civ. Proc., § 1085.)

the irreparable injury exception by such a restrictive interpretation. (See cases cited *ante,* p. 1017.) The concept of irreparable injury has been carefully addressed in cases dealing with injunctive relief and the following definition, taken from that line of cases, is, I believe, applicable to a discussion of the exceptions to the exhaustion rule: "[Irreparable injury is] a wrong which the trial judge no doubt deemed insufferable because it constitutes an overbearing assumption by one person of superiority and domination over the rights and property of others." (*Fretz* v. *Burke* (1967) 247 Cal.App.2d 741, 746 [55 Cal.Rptr. 879]; cf. *Anderson* v. *Souza* (1952) 38 Cal.2d 825, 834 [243 P.2d 497]; *Wind* v. *Herbert* (1960) 186 Cal.App.2d 276, 285 [8 Cal.Rptr. 817].) With this definition in mind, Judge Woolpert's decision to take jurisdiction in this case is easily characterized as a conclusion that the curtailment of respondent's religious freedom, which he found to be threatened by any further procedural delay, constituted irreparable injury. Furthermore, since there is nothing in the record to contradict this finding, it cannot be said that the superior court committed error.

Despite these conclusions, drawn from the record of the lower court proceedings, there is in the record no explicit finding by the superior court that irreparable injury excuses the exhaustion rule in this case. For that matter, the superior court does not name any exception to the exhaustion rule upon which it based the decision to intervene in the prison's administrative process. Nevertheless, where findings are not made by the lower court, it must be presumed that that court made all findings necessary to support its judgment. (*Gray* v. *Gray* (1921) 185 Cal. 598, 599 [197 P. 945].) Moreover, a lower court's decision will be upheld if it is valid under any applicable theory of law, regardless of the actual reason (or, as in this case, the lack thereof) for that decision. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)[5] Since it may be determined from the record in this case that the trial court made findings of fact to which the irreparable injury exception is applicable, I conclude that the court properly waived the requirement that respondents exhaust their administrative remedies and that the court had jurisdiction to grant respondents' petition for writ of

---

[5]This conclusion also disposes of appellants' argument that the superior court erred in relying on section 3241 of the rules and regulations of the Department of Corrections (Cal. Admin. Code, tit. 15), as authority for its order permitting the respondents' outside donations. If the superior court was correct under any applicable theory of law in ordering the Men's Colony to permit the donations, the actual reasons which the court gave for its order are immaterial. (*D'Amico* v. *Board of Medical Examiners, supra.*)

habeas corpus. It must now be determined if the respondents' constitutional[6] challenge justified the habeas corpus relief granted by the superior court.

### 2. *Infringement of Respondents' Right to Free Exercise of Religion*

First dealing with those portions of appellants' argument which claim that respondents' Church is not really a religion and that its activities are not really religious: I find nothing in the record which would require the belief that the Church of the C.O.N.V.I.C.T. Ministers is not a bona fide religion or that its members are not entitled to appropriate constitutional protection. For example, the Church's guidelines affirm "that God is both Creator and Judge of all mankind," and that Church members should therefore "share his [sic] concern for Justice [sic] and reconciliation throughout human society, and for the liberation of mankind from every kind of Oppression." To achieve this goal, the Church calls upon its members to participate in Bible study and a program of youth counselling to be directly supported by inmate donations to the Church's outside fund. These professed beliefs certainly fall within the concept of "religion" as recognized by the courts. (See, e.g., *United States* v. *Seeger* (1965) 380 U.S. 163 [13 L.Ed.2d 733, 85 S.Ct. 850]; *Theriault* v. *Silber* (5th Cir. 1977) 547 F.2d 1279, 1281; *Wilson* v. *Beame* (E.D.N.Y. 1974) 380 F.Supp. 1232, 1242; *Lee* v. *Crouse* (D.Kan. 1967) 284 F.Supp. 541, 546 [affd. on app., adopted lower court opn. 396 F.2d 952].) Moreover any further inquiry into the validity of respondents' religious beliefs is foreclosed by the constitutional guarantee of freedom of religion. (*United States* v. *Seeger, supra,* at pp. 184-185 [13 L.Ed.2d at p. 747]. *Cooper* v. *Pate* (7th Cir. 1967) 382 F.2d 518, 521; *People* v. *Woody* (1964) 61 Cal.2d 716, 726 [40 Cal.Rptr. 69, 394 P.2d 813]; *Estate of Supple* (1966) 247 Cal.App.2d 410, 415 [55 Cal.Rptr. 542].) I cannot be so presumptuous as to conclude that the mere absence of traditional religious trappings makes respondents' religion unworthy of respect. As the Court of Appeal

---

[6]Although respondents' *pro se* petition for relief raises only First Amendment issues, the petition, when liberally construed (see fn. 3, *ante*), raises generally the question of religious freedom. Consequently, it is necessary to insure that respondents' religious freedom has not been violated under either federal or state constitutional law. (See *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 765, fn. 43 [135 Cal.Rptr. 345, 557 P.2d 929].) The discussion of constitutional rights which follows must be interpretive of the California Constitution's guarantee of religious freedom (art. I, § 4) as well as of the First Amendment to the United States Constitution. The analysis involves both state and federal precedents since the federal cases are dispositive of the federal constitutional issue (*United States* v. *Reynolds* (1914) 235 U.S. 133, 148 [59 L.Ed. 162, 168, 35 S.Ct. 86]) while both state and federal cases are instructive on the state constitutional issue (*Serrano* v. *Priest, supra,* at pp. 764-765 of 18 Cal.3d.)

noted in *Hardwick* v. *Board of School Trustees* (1921) 54 Cal.App. 696 [205 P. 49]: "Manifestly, a person may have religious views or principles of his own, different, perhaps, on doctrinal matters, from those of any church organization or any other person. He may have a way, peculiar to himself, of worshipping the Supreme Being, and there is no logical ground for holding that in thus worshipping his Maker, he is not equally entitled with every other person or church society to the protection of the constitutional guaranties . . . ." (54 Cal.App. at p. 706.)

Appellants' claim is unsupported that donations to the outside bank account were not essential or even incidental to respondents' religion. As previously stated the decision to grant relief to respondents reflected a determination by the superior court, made after an evidentiary hearing, that religious services and outside donations were so important to the free exercise of respondents' religion that exhaustion of administrative remedies should not be required before the court intervened. No claim to the contrary, made for the first time in an appellate brief, can justify the overturning of that factual determination absent a clear showing of error in the record. (*People* v. *Clifton* (1969) 270 Cal.App.2d 860, 862 [76 Cal.Rptr. 193].) Appellants have not referred us to any evidence in the record which warrants reversal of the superior court's findings. The court's implicit conclusion that the religious services and outside donations which it authorized are important elements of respondents' religion must therefore be accepted.

As important elements of their religious practice, respondents' rights to religious services and outside donations are deserving of the protection afforded by the constitutional guaranties of religious freedom. Nevertheless, as sacred as religious liberty is in the abstract, some curtailment is necessitated by the realities of penal confinement. Religious freedom embraces both the freedom to believe and the freedom to act. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352].) While the first is absolute, the second cannot be; conduct is subject to regulation to protect society. (*Id.*)

Nonetheless, when governmental regulation of religious conduct is challenged, it is basic that no mere showing of a rational relationship to a governmental interest will suffice. (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 406 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790]; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 241 [49 Cal.Rptr. 537, 411 P.2d 289]; *People* v. *Woody, supra,* 61 Cal.2d 716, 718.) Where governmental action imposes a burden on the individual's ability to express religious beliefs, two tests

must be satisfied. The first is a clear showing that any incidental burden on the free exercise of religion is justified by a compelling state interest in the regulation of a subject within the state's constitutional power to regulate. (*Sherbert* v. *Verner, supra,* 374 U.S. 398; *In re Van Geldern* (1971) 5 Cal.3d 832, 837 [97 Cal.Rptr. 698, 489 P.2d 578]; *People* v. *Woody, supra,* 61 Cal.2d 716.) In this regard, only the gravest abuses endangering paramount interests, can warrant permissible limits on the free exercise of religion. (*Sherbert* v. *Verner, supra; People* v. *Woody, supra,* at pp. 718-719 of 61 Cal.2d.) The second test requires an equally strong showing that no alternative form of regulation would combat such abuses without curtailing freedom of religion. (*Sherbert* v. *Verner, supra,* 374 U.S. at p. 407 [10 L.Ed.2d at p. 972]; *People* v. *Woody, supra,* at p. 723 of 61 Cal.2d.) For, "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247]; cf. *Barnett* v. *Rodgers* (D.C.Cir. 1969) 410 F.2d 995, 1000.)[7]

Nor are the above tests inapplicable simply because the respondents in this case are prisoners. It is well accepted that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by considerations underlying our penal system." (*Price* v. *Johnston* (1948) 334 U.S. 266, 285 [92 L.Ed. 1356, 1369, 68 S.Ct. 1049]; cf. *In re Ferguson* (1961) 55 Cal.2d 663, 671 [12 Cal.Rptr. 753, 361 P.2d 417].) But, at the same time, one entering a prison is not entirely bereft of all his civil rights and does not forfeit every protection of the law. (*In re Van Geldern, supra,* 5 Cal.3d at p. 836.)

"To say that religious freedom may undergo modification in a prison environment is not to say that it can be suppressed or ignored without adequate reason. And although 'within the prison society as well as

---

[7]Pointing to the secular nature of an outside bank account, appellants direct attention to several cases which permit regulation of those religious activities "characteristic of the secular life of the community" and therefore "properly . . . a concern of the community even though they are carried on by a religious organization." (*Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232, 243, 244-245 [163 P.2d 704]; cf. *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 109 [87 L.Ed. 1292, 1296, 63 S.Ct. 870, 891, 146 A.L.R. 81]; *In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850, 858 [121 Cal.Rptr. 899].) But these cases, while acknowledging the right of secular authority to impose reasonable *regulation* on religious activities of a secular nature, do not address the problem presented here, namely, whether prison officials can impose *a total ban* on activity which a lower court considered essential to the practice of an inmate group's religion.

without, the practice of religious beliefs is subject to reasonable regulations, necessary for the protection and welfare of the community involved,' the mere fact that government, as a practical matter, stands a better chance of justifying a curtailment of fundamental liberties where prisoners are involved does not eliminate the need for reasons imperatively justifying the particular retraction of rights challenged at bar. Nor does it lessen governmental responsibility to reduce the resulting impact on those rights to the fullest extent consistent with the justified objective." (*Barnett* v. *Rodgers, supra,* 410 F.2d at pp. 1000-1001; see *In re Jordan* (1972) 7 Cal.3d 930, 934 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Van Geldern, supra,* 5 Cal.3d at pp. 836-837.)[8]

In the instant case, the superior court obviously concluded that the prison authorities' curtailment of respondents' fundamental religious freedom was so burdensome as to warrant judicial intervention in the prison's administrative process. There is, as previously noted, nothing in the record to justify concluding otherwise and therefore we should decline to do so. As a consequence, the burden is on the appellants to satisfy the two-tiered strict scrutiny test outlined above. (*People* v. *Woody, supra,* 61 Cal.2d at pp. 718-719.)

The record in this case is totally lacking in evidence which would satisfy the strict scrutiny test for the validity of prison regulations which interfere with the free exercise of religion. In fact, the only attempt to justify the prison administration's decision is made by the Attorney General on appeal. He contends that the prison administrators were entitled to forbid outside bank account donations by respondents because of their inherent statutory authority to protect the public by safely keeping persons committed to their custody. Specifically, it is argued that, had the outside donations been approved, the prison administrators would have been concerned that: (1) the respondents'

[8]This view in this regard is reinforced by the California Legislature's recent expansion of prison inmates' constitutional rights. Formerly, Penal Code section 2600 suspended all civil rights of those committed to state prison save for certain rights enumerated in that section. Section 2600 was commonly known as the "Civil Death" statute. (*In re Van Geldern, supra,* 5 Cal.3d at p. 836.) In 1975, however, the Legislature repealed the language of section 2600 (Stats. 1975, ch. 1175, § 2) and with it the concept of "Civil Death." In its place, the new section 2600 (added by Stats. 1975, ch. 1175, § 3) now provides that a prisoner may be deprived of only those rights as is necessary for the reasonable security of the institution and the reasonable protection of the public. (See *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 913 [132 Cal.Rptr. 405, 553 P.2d 565].) To this statutory expansion of prisoners' rights must be added the Legislature's express declaration in Penal Code section 5009 that: "It is the intention of the Legislature that all prisoners shall be afforded reasonable opportunities to exercise religious freedom."

group might use its worthy objectives as a subterfuge to collect public donations which would then be diverted to the inmates' own personal pecuniary advantage; (2) the outside sponsors who maintain the fund on behalf of respondents might abscond with the funds raised; and (3) either the inmates or the outside sponsors might use the funds for other illegal or improper purposes.

Suffice it to say that these highly speculative concerns are insufficient cause for the wholesale prohibition of religious expression engendered by the Men's Colony's decision to bar the respondents' outside donations. Though I am mindful of the deference to be given prison authorities in matters of inmate administration (see, e.g., *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119 [53 L.Ed.2d 629, 638-639, 97 S.Ct. 2532]), a clear showing of the threat to public peace or prison security must be made before prisoners' free exercise of religion can be so conclusively abridged. (*Long* v. *Parker* (3d Cir. 1968) 390 F.2d 816, 822; *Cooper* v. *Pate, supra,* 382 F.2d 518, 521-522; *Battle* v. *Anderson* (E.D.Okla. 1974) 376 F.Supp. 402, 427; *Northern* v. *Nelson* (N.D.Cal. 1970) 315 F.Supp. 687, 688; *People* v. *Woody, supra,* 61 Cal.2d 716, 724.) There is in the record of this case no hint of the serious potential for disorder or violence which in the past has justified the curtailment of prison inmates' fundamental rights. (See, e.g., *In re Ferguson, supra,* 55 Cal.2d 663.) Mere speculation as to the potential detriment which inmates or the public might suffer is not enough[9] and certainly does not rise to the status of the compelling justification needed for the restraint of religious freedom imposed by the prison authorities in this case.[10] (See *Long* v. *Parker, supra,* 390 F.2d 816; *Cooper* v. *Pate, supra,* 382 F.2d 518; *Battle* v. *Anderson, supra,* 376 F.Supp. 402; *Northern* v. *Nelson, supra,* 315 F.Supp. 687; *People* v. *Woody, supra,* 61 Cal.2d 716.)

Nor do the appellants make any showing that a total ban on the outside donations is the least restrictive means of insuring either prison security or public safety. No indication is given why the prison

[9]It is noteworthy that the highest court of New York has held that the New York Constitution's guarantee of religious freedom (art. I, § 3), which is virtually identical to article I, section 4, of the California Constitution, requires adherence to this same standard. (*Brown* v. *McGinnis* (1962) 10 N.Y.2d 531 [225 N.Y.S.2d 497, 500-501, 180 N.E.2d 791].)

[10]Indeed, appellants' concern that the public might be duped into charitable contributions to a bogus fund or that the Church's outside sponsor might abscond with the funds, would seem to be irrelevant. Whatever the decision of the prison administration may be concerning respondents' right to make donations, the outside fund itself is beyond prison control and may continue to exist. Thus, no action of the prison administrators could possibly alleviate any threat posed by the fund itself.

authorities could not simply impose rigorous accounting procedures or other similar safeguards on both Church members and the outside sponsor as a condition precedent to approval of the donations.[11] Thus, appellants fail to satisfy the second portion of the applicable strict scrutiny test.

In defense of the prison authorities exercise of discretion in this matter, appellants urge us to adopt the rationale of *Jones* v. *North Carolina Prisoners' Union, supra,* 433 U.S. 119. In that case, curtailment of prisoners' rights of free speech and association was upheld on grounds of deference to prison authorities' discretion to restrict those fundamental constitutional rights for the sake of institutional security. Noting the First Amendment rights were barely implicated (433 U.S. at p. 129 [53 L.Ed.2d at p. 641]), the Supreme Court held unnecessary any affirmative showing by prison authorities that the challenged restrictions on free speech and association "would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order,'" choosing instead to rely on the expert judgment of correction officials. (*Id.* at p. 128 [53 L.Ed.2d at p. 640].) Appellants argue that *Jones* not only validates the ban on respondents' outside donations in this case but also relieves the appellants from making any affirmative showing that the outside bank account poses a clear danger to institutional security.

The standards enunciated in *Jones* are not applicable to this case. First, though clearly a First Amendment case, *Jones* does not in terms apply to alleged infringement of religious freedom. Second, the free exercise of religions is by no means "barely implicated" in this case as it was in *Jones.* As noted repeatedly in this opinion, the superior court considered the relief it granted to the respondents to be so crucial to the free exercise of respondents' religion as to justify excusing the otherwise strict requirement of exhaustion of administrative remedies; this finding should not be disturbed. Third, and perhaps most important, even if *Jones* were dispositive of the respondents' case under the First Amendment, it would still be obligatory to search the law to determine if appellants' actions satisfied California constitutional requirements. (See fn. 7, *ante;* also, *Serrano* v. *Priest, supra,* 18 Cal.3d 728, 764-765; *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 616 [127 Cal.Rptr. 244].)

---

[11]Appellants' citation of various administrative regulations is equally unconvincing in this regard since those regulations assume the very point at issue here, namely, whether the prison authorities are justified in utilizing these regulations to prohibit respondents" religious activities.

In this last regard I conclude that, at least for purposes of the California constitutional guarantee of religious freedom, judicial deference to prison authorities is simply not enough. Instead, the two-tiered strict scrutiny test previously outlined is applicable and must be used to take the measure of prison regulations which interfere with religious liberty. As previously concluded, appellants fail to pass this test: consequently, the superior court's order was not in error.

To summarize, I quote from the decision of the United States Court of Appeals in *Barnett* v. *Rodgers, supra,* 410 F.2d 995, 1002: "That penal as well as judicial authorities respond to constitutional duties is vastly important to society as well as the prisoner. Treatment that degrades the inmate, invades his privacy, and frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect erodes the very foundations upon which he can prepare for a socially useful life. Religion in prison subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality."

I conclude that the superior court properly took jurisdiction over respondents' case without first requiring exhaustion of administrative remedies; also that, having assumed jurisdiction, the superior court properly decided that the prison authorities' prohibition of respondents' donations to an outside bank account, used to foster their religious program, violated the respondents' constitutional right to the free exercise of religion.[12]

The order should be affirmed.

Petitioners' application for a hearing by the Supreme Court was denied March 30, 1978. Newman, J., was of the opinion that the application should be granted.

---

[12]I add that nothing stated in this opinion should be construed to limit a continuing overview of the right herein recognized. If it is found that there is a misuse of such right to the detriment of penal security or necessary control, either effective inside or outside of a penal facility, reconsideration and review by the proper authorities is not prohibited.