[No. A065255. First Dist., Div. Three. Jan. 5, 1996.]

In re BERNARD HAMILTON on Habeas Corpus.

**COUNSEL**

Daniel E. Lungren, Attorney General, Kenneth C. Young, Assistant Attorney General, Bruce M. Slavin and Catherine A. McBrien, Deputy Attorneys General, for Petitioner.

Arnold Erickson, under appointment by the Court of Appeal, for Respondent.

**OPINION**

**MERRILL, J.**—Daniel Vasquez, warden of the prison at San Quentin, appeals from an order of the Marin County Superior Court enjoining prison officials from charging inmates a 10 percent surcharge on handicraft materials purchased through the prison's handicraft program. We vacate the order for reasons explained below.

FACTS

Penal Code[1] sections 5005 and 5006 authorize the Department of Corrections to operate canteens and hobby shops at correctional facilities throughout the state. Section 5005 instructs the Director of Corrections to "fix" prices of articles offered for sale through the canteens at such amounts "that will, as far as possible," render the programs "self-supporting." Section 5006 directs that the net proceeds from the operation of the canteens and hobby shops be deposited in the Inmate Welfare Fund (IWF), which fund "shall be

---

[1] All further statutory references are to the Penal Code.

used for the benefit, education, and welfare of inmates . . . including but not limited to the establishment, maintenance, employment of personnel for, and purchase of items for sale [at the canteens] . . . , and for the establishment, maintenance, employment of personnel and necessary expenses in connection with the operation of the hobby shops . . . ."

In conjunction with the hobby shops, section 2813 provides for the development of handicraft programs at each correctional institution. The provision states: "The director may provide for the manufacture of small articles of handiwork by the prisoners out of raw materials purchased by the prisoners with their own funds or funds borrowed from the [IWF], or from raw materials furnished by the director without compensation therefor as provided in this section which articles may be sold to the public at the state prisons, in public buildings, at fairs, or on property operated by nonprofit associations. State-owned property shall not be given to prisoners for use under this section, unless all proceeds from the sale thereof shall be deposited in the [IWF]. The director may provide that all or a part of the sale price of all other articles manufactured and sold under this section be deposited to the account of the prisoner manufacturing the article."

Pursuant to these statutes, a 10 percent surcharge which operates as a prison sales tax is charged on all items bought or sold by inmates incarcerated at San Quentin. This includes purchases at the prison canteen which offers such things as "toilet articles, candy, tobacco products, notions, and other sundries." (§ 5005.) And it includes purchases of handicraft materials through the prison's handicraft program. Program participants who then wish to sell their finished products must add the surcharge to the sales price of these products. Money derived from each surcharge is deposited in the IWF.

The surcharge that is being challenged in this case is that imposed on the purchase of handicraft materials. Respondent Bernard Hamilton is an inmate at San Quentin who regularly purchases such materials and who petitioned the superior court for a writ of habeas corpus claiming that the subject surcharge is unlawful. Before specifically addressing the issues he raises, however, some background information about the handicraft program is in order.

The stated purpose of the handicraft program at San Quentin, as well as other state prisons, is to allow "constructive use of the inmates['] leisure time by affording them a program in which they may expand their creative potential. The program [further] provides a means for the inmates to earn money to help supplement their financial resources." (Dept. of Corrections,

Operations Manual (July 21, 1992) Handicraft Program, p. 53080-4.) Each prison's program is overseen by a "handicraft manager" who "provides direct supervision and implementation of the program." (*Ibid.*)

The warden or superintendent of each correctional facility may establish institutional procedures regulating the operation of these programs. (Cal. Code Regs., tit. 15, § 3100, subd. (a).) Operational procedure for the handicraft program at San Quentin is contained in "Institution Procedure" (I.P.) 207 and 215. Under I.P. 207, strict security measures characterize all aspects of the program, including the purchase of handicraft materials and supplies.[2] Participating inmates obtain their materials generally by way of special orders placed with authorized outside vendors.[3] These orders are submitted through the handicraft manager. Inmates are not allowed to place orders directly with vendors or to receive gifts of handicraft materials from people outside of the prison.

For purposes of ordering, the prison provides participating inmates with a list of approved materials[4] plus catalogs supplied by the vendors. Using these, the inmate fills out an order form and submits it to a "[h]andicraft [c]lerk" who then types the purchase order. Thereafter, the purchase order is reviewed by both the handicraft manager and the "area administrator" who must approve it before it goes any further. Upon approval, the order is logged in a log book and forwarded to the prison's "procurement" department.

At procurement, a special purchase order number is assigned to the order. The order is then sent on to the "trust office" for verification that the inmate has sufficient funds to cover the cost of the purchase. The total cost of the purchase includes shipping charges, the applicable sales/use tax, and the aforementioned 10 percent surcharge (against the merchandise total) for deposit in the IWF. From here, the order is finally mailed out to the vendor.

Larry Heer, manager of San Quentin's handicraft program, testified at the hearing on Hamilton's petition. According to Heer, money derived from the subject surcharge is used principally to cover the cost of the prison's handicraft shop including the purchase and maintenance of machines and equipment therein. Funds from the surcharge additionally cover the cost of

[2]Inmates are restricted both in terms of the type of materials they order and the quantity of materials they order. The amount of hobby materials in an inmate's cell cannot exceed $200 in value. Additionally, hobby materials, personal property and state property in an inmate's cell may not exceed a combined volume of six cubic feet. (I.P. 207 and 215.)

[3]Inmates may also obtain handicraft materials as gifts from other program participants. (Cal. Code Regs., tit. 15, § 3107.)

[4]For condemned prisoners, materials must be approved on an individual basis. (I.P. 207.)

postage on inmates' purchase orders. Heer noted in this respect that inmates purchase materials on an ongoing basis. Heer admitted that his salary and that of others involved in the program are paid through state operating funds, not the IWF. However, he claimed that if one were to consider these salaries (totaling approximately $80,000), the program is not self-supporting—"not even close."

Evidence offered by Hamilton included an audit statement for San Quentin's IWF. While it is unclear exactly what period is covered by the statement, it indicates that it is "For [the] Period Ending: April 30, 1993." According to the statement, the prison's handicraft program during the applicable period received an income of $7,426.40 with expenses totaling $1,337.35 ($225.57 for "minor equipment and supplies" and $1,111.78 for "inmate pay"), resulting in a net profit of $6,089.05. The income figure apparently reflects income from both the surcharge on the purchase of handicraft materials and the surcharge on the sale of finished handicraft items.

On January 20, 1994, the superior court issued an order enjoining the prison from imposing the surcharge on the purchase of handicraft materials. This appeal followed.

## THE INSTANT APPEAL

While conceding that the surcharge on canteen items and completed handicraft products is valid under the applicable statutes, Hamilton challenges the surcharge on handicraft materials purchased not through the canteens but through outside vendors. Hamilton argues: "[T]he Legislature's specification in section 2813 that the sale price of manufactured handicraft articles may be diverted to the [IWF] implies that other, non-specified methods of raising [IWF] monies are prohibited. As such, a surcharge on handicraft material purchases is not authorized and is unlawful."

Countering this argument, appellant asserts that the plain language of sections 5005, 5006 and 2813, makes it clear that the Legislature intended that all of these programs be as self-supporting as possible. In keeping with this, he says, the Legislature vested the director with broad discretionary power in fixing the prices of items sold through the programs to create a surplus of money for the perpetual funding of the IWF and, thereby, the programs themselves. He argues: "The fact that the Legislature did not fix a specified amount that could be deducted for retention by the prison illustrates the breadth of discretion given to the prison in determining what revenues are needed to maintain the handicraft program."

■ Preliminarily, we note our standard of review in examining these issues: inasmuch as the evidence presented below was essentially without conflict, we are not bound by the trial court's findings and, thus, determine the issues as a matter of law. Having said this, we turn to the matters at hand.

■ "The fundamental rule [in construing a statute] is that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] '[A] construction making some words surplusage is to be avoided.' [Citation.] When used in a statute words must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear, and the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.] In addition, we consider the legislative history of the statute as well as the historical circumstances of its enactment in determining the intent of the Legislature. [Citation.]" (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].)

" 'One of the cardinal rules of construction requires that words be given such interpretation as will promote rather than defeat the *general purpose and policy* of the law. [Citation.] A statute should be interpreted so as to produce a result that is reasonable. [Citation.] If two constructions are possible, that which leads to the more reasonable result should be adopted.' [Citation.]" (*Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382, 388 [207 Cal.Rptr. 652].)

■ Keeping these principles in mind, we examine the pertinent statutes here—i.e., sections 5005, 5006, and 2813. Section 2813, formerly section 2877, predates the other two provisions and is found in part 3, title 1, of chapter 6 of the Penal Code governing "Sale of Prison-made Goods." Sections 5005 and 5006, meanwhile, are contained in part 3, title 7, chapter 1 of the code covering the "Department of Corrections." Section 2813 essentially authorizes the development of handicraft programs at the various correctional institutions whereas section 5005 is the authority for the canteen programs. Section 5006 then creates the IWF to provide funding for these as well as other programs benefiting prison inmates. Section 5006 directs that all net proceeds from the canteen and handicraft programs be deposited in the IWF. It further directs that "[t]he monies in the fund shall constitute a trust held by the Director of Corrections for the benefit and welfare as herein defined of all of the inmates of institutions and prisons under the jurisdiction of the Department of Corrections."

Reading these provisions together, we find: (1) clear legislative intent that the canteen and handicraft programs be as self-supporting as possible; and (2) broad discretionary power vested in the director of the Department of Corrections to carry out this mandate. And we conclude: although none of the subject statutes specifically authorizes a surcharge on handicraft materials purchased through the handicraft program, such authority is manifest based on these factors.

First, the Legislature's intent that the programs be self-supporting could not be more clear. Section 5005 specifically says so relative to the canteen program. It states: "The sale prices of the articles offered for sale shall be fixed by the director at the amounts that will, as far as possible, *render each canteen self-supporting*." (Italics added.) Section 2813, meanwhile, impliedly says so relative to the handicraft program based on its dictate that program participants purchase their own materials and that "[s]tate-owned property . . . not be given to prisoners for use under this section, unless *all* proceeds from the sale thereof shall be deposited in the [IWF]." (Italics added.)

Next, the discretionary power vested in the director to carry out this mandate is exceptionally broad. Section 5005 empowers the director to "fix[]" the sale prices of articles sold through prison canteens in order to attain the self-supporting goal. And it leaves the amount of the surcharge totally to his discretion. Similarly, section 2813 authorizes the director to direct that "all or a part of" the sale prices of handicraft items sold through the handicraft program be deposited to the accounts of prisoners manufacturing said articles. The Legislature has vested the director with considerable discretionary power by which to attain the goal of a self-supporting program. The subject surcharge clearly falls within the ambit of this power.

Hamilton's claim that the surcharge on the sale of handicraft items authorized by section 2813 provides the exclusive means by which the director can collect monies for this purpose, is simply unfounded. First, sections 5005, 5006 and 2813 grant the director extensive power for the purpose of raising money by which to fund the program.

Second, to limit fund raising to the surcharge on the sale of handicraft items would place such funding on highly speculative grounds. Inmates are not required to sell the items they make and of those who choose to do so, certainly not all are successful. Limiting funding in this way would impose an unfair burden on those inmates who are talented and fortunate enough to sell their wares. We do not think the Legislature intended such unreasonable results.

We find added support for our findings in dicta contained in *In re van Geldern* (1971) 5 Cal.3d 832 [97 Cal.Rptr. 698, 489 P.2d 578], a case

heavily relied on by Hamilton. In *In re van Geldern,* the high court struck down Department of Corrections "rule 2505" requiring inmate authors to relinquish 25 percent of their profits and royalties from published writings, to be deposited in the IWF. (5 Cal.3d at p. 834.) The stated rationale for the assessment was " '[t]o defray handling costs.' " (*Ibid.*) Under rule 2505, an inmate was required to sign an agreement authorizing the deduction prior to submission of the manuscript for publication.

In analyzing the validity of the rule, the Supreme Court said, "If the reason for a prison surcharge is to defray costs, it must have some correlation to those costs or it is arbitrary and impermissible." (*In re van Geldern, supra,* 5 Cal.3d 832, 837.) The court then found, based on the evidence in that case, that there was no such correlation. According to the evidence, while there were certain handling costs associated with reviewing the manuscripts before they were sent out of the prison, said costs were covered by funds other than the IWF. Moreover, all costs of production of the manuscripts were borne by the inmates themselves. (5 Cal.3d at p. 835.)

The *In re van Geldern* court then said: "We next turn to the question whether the assessment can be justified on the ground that the purpose of the 25 percent charge is not to defray prison expenses *but to provide a source of support for the [IWF].*" (5 Cal.3d at p. 837, italics added.) Following its analysis of the question, the court found that there was no justification for the 25 percent handling fee on this basis either. However, in reaching its conclusion the court drew a distinction in this regard between inmate authors and inmates in prison handicraft programs. The court said: "The [IWF] itself . . . provides no special benefits to inmate-authors. Certain other activities for which inmates must contribute to the fund are benefited by fund moneys. Inmates engaged in handicrafts must pay a 10 percent surcharge on the purchase of materials, and the [IWF] contributes to the operation of the handicraft shop including certain supplies and pays wages and benefits to the personnel in charge of the arts and crafts program. When inmate craftsmen lack sufficient funds to purchase materials they may obtain loans from the fund. [Citation.] These services benefit inmate-artists in a similar fashion. Moreover, the prison provides for fairs and exhibitions within the walls where prisoner arts and crafts may be sold to the public." (5 Cal.3d at p. 837.)

By way of dicta, the *In re van Geldern* court indicates that a surcharge on the purchase of handicraft materials is justifiable as a source of support for the IWF.

Thus, on the basis of our interpretation of the pertinent statutes and dicta in *In re van Geldern,* we find the subject surcharge both authorized and

justified. Money derived thereby goes into the IWF which directly benefits handicraft program participants. In his testimony, handicraft manager Larry Heer attested to the numerous costs associated with San Quentin's handicraft program. Although these apparently do not include personnel costs, they include numerous other cost items such as: the establishment and maintenance of the prison handicraft shop; the purchase of new equipment for the shop; postage for inmates' purchase orders; fairs and exhibitions for the purpose of exhibiting and selling handicraft products; and loans for craftsmen in need.

Nor are we deterred from our findings by the audit statement provided by Hamilton indicating that for one auditing period San Quentin's handicraft program earned a significant profit. Its probative value is significantly limited by the fact that it represents only one auditing period. It cannot be said to be representative of the program's finances on an ongoing basis. As an example, while the subject statement notes expenses for only "minor equipment and supplies," it is apparent from Heer's testimony that there are times in which significant machine and equipment purchases are made. Moreover, the fact that the income figure reflects income from the surcharge on handicraft sales as well as income from the surcharge on handicraft purchases, further demonstrates the limited relevancy of this evidence (i.e., money generated in the former category will necessarily vary from one period to the next).

## Disposition

The order is vacated, and the matter is remanded to the trial court with directions to deny Hamilton's petition and to discharge the order to show cause.

Appellant shall receive costs on appeal.

Chin, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied January 31, 1996, and petitioner's application for review by the Supreme Court was denied March 28, 1996. Chin, J., did not participate therein.