[Civ. Nos. 38801, 40034, 41036. First Dist., Div. One. Jan. 7, 1981.]

GLENN HULL et al., Plaintiffs and Appellants, v.
DALLAS CASON et al., Defendants and Appellants;
DAVID T. ANDRADE et al., Interveners and Appellants;
JAMES MICHAEL RECORDS et al., Claimant-interveners
and Appellants.

COUNSEL

Bonjour, Gough, Stone & Remer, Kerry M. Gough, Clifford C. Sweet, Malcolm Hunter, Bancroft, Carter, Ogren, Porter & White and James S. White for Plaintiffs and Appellants.

Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Fred Okrand, Mark D. Rosenbaum, Terry Smerling, Robert Stanley Florey III, David A. Garcia, Dale L. Brodsky, Marjorie E. Cox, Marjorie Gelb, Lutz Alexander Prager, Susan Rubenstein, Issie L. Jenkins and Joseph T. Eddins as Amici Curiae on behalf of Plaintiffs and Appellants.

Allan Yannow, Arnold Forster, Jeffrey Sinensky and Richard Weisz as Amici Curiae on behalf of Plaintiffs and Appellants and Intervener and Appellant Andrade.

Davis, Cowell & Bowe, Duane W. Reno, Philip Paul Bowe, David A. Self, City Attorney, and William C. Sharp, Assistant City Attorney, for Defendants and Appellants.

Carroll, Burdick & McDonough, Christopher D. Burdick, Ronald Yank and David Handsher for Interveners and Appellants.

Orrick, Herrington, Rowley & Sutcliffe, Beilock, Sax & Wilson and Brian M. Sax for Claimant-interveners and Appellants.

**OPINION**

**ELKINGTON, J.**—Our opinion and decision on the above captioned appeals was filed December 26, 1978. The Supreme Court granted a hearing after which, June 19, 1980, it made the following order:

"The above entitled cause is retransferred to the Court of Appeal, First District, Division One, for reconsideration in light of *Price* v. *Civil Service Commission* (1980) 26 Cal.3d 257; *Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 328-332; and *Firefighters Institute* v. *City of St. Louis, Mo.* (8th Cir. 1978) 588 F.2d 235, 239-242, cert. den. sub nom. *Banta* v. *Firefighters Institute* (1979) 443 U.S. 904."

We have reconsidered the cause as directed, and conclude that we had earlier correctly resolved it. We state our reasons.

The superior court had adjudged, among other things, that "[i]n order to ameliorate the effects of past racial discrimination, [the City of Oakland's] appointment of fire fighters ... shall [for 5 years] be at the rate of at least two racial minorities for each Caucasian ...." (And see pp. 357-358, *infra.*)

As will be seen hereafter and from the foregoing editorial summary and headnotes, the appeals concern the developing concept, sometimes described by the catch phrase "affirmative action," of remedying evils of the states' and nation's historical racial discrimination.

There are few who disagree as to the pressing need for such affirmative action, but there is broad dispute as to the means of its implementation. (See, e.g., *University of California Regents v. Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]; *Price v. Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365].) Some believe that present racial discrimination in public employment against individually faultless nonminority persons is rationally, and constitutionally, acceptable, as a sort of atonement for sins of earlier days. Others insist that there may be no public racial discrimination at all; they side with Justice William O. Douglas in his dissent in *DeFunis v. Odegaard* (1974) 416 U.S. 312 [40 L.Ed.2d 164, 94 S.Ct. 1704], *passim*: "'The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States.'" "'Minorities in our midst who are to serve actively in our public affairs should be chosen on talent and character alone, ... There is no constitutional right for any race to be preferred.... The Equal Protection Clause commands the elimination of racial barriers, not their creation ...."

We first consider the case of *Price v. Civil Service Com., supra*, 26 Cal.3d 257.

In 1974 Sacramento County was concerned with the relative paucity of minority persons in the county's employ. Through its civil service commission it conducted a series of hearings into the county's past hiring practices in an attempt to ascertain the reasons for the underrepresentation and to identify potential courses of action to ameliorate the situation. The hearings disclosed a number of discriminatory practices continuing to the date of the hearings, which operated to screen out a disproportionate number of minority job applicants. A rule was adopted permitting the civil service commission, after public hearing and a finding of existing racial discrimination, to "order that minority personnel shall be appointed to the classification involved in accordance with an alternating ratio until a specified number of minority persons have been hired." Such an order remained subject to modification, or rescission, according to the "'needs of the service, changed circumstances, problems encountered in implementing the order, and information which was not previously considered ....'" (P. 265.)

Thereafter a county department was found with a near complete absence of minority person employees. The civil service commission took no immediate action, relying upon the department head's assurances that he would undertake additional efforts to recruit and hire such persons. The assurances were periodically repeated but when, more than a year later, no minority persons had yet been hired the commission, after a hearing, issued a remedial order. The order specified (p. 266) that new employments of the department "shall be made on the basis of an alternating ratio of 2:1 so that at least one minority person is appointed for every two nonminority persons' and that '[s]aid ratio shall be applied only until the percentage of minorities'" was raised from 1.54 percent to 8 percent. (The county had a 19.5 percent minority population.) Instead of complying, the department head successfully sought a judicial declaration that the county's order was unconstitutional and void.

On appeal the state's Supreme Court disagreed, holding (p. 269) that the county's rule and order—"directed specifically at ameliorating minority underrepresentation which is found to have resulted from the county's own discriminatory employment practices"—was constitutionally and statutorily valid.

*Dothard* v. *Rawlinson* (1977) 433 U.S. 321 [53 L.Ed.2d 786, 97 S.Ct. 2720].

Dianne Rawlinson was a 22-year-old college graduate who had majored in correctional psychology. Her application for employment as a correctional counselor (i.e., prison guard) in Alabama was rejected because she failed to meet the state's correctional counselor employment criteria. At issue in the high court were the minimum weight and height requirements of 120 pounds and 5 feet 2 inches, and a regulation barring employment of women in "contact" positions of male maximum-security prisons.

A divided high court upheld the district court's determination that the height and weight requirements operated as such a "barrier to equal employment opportunity that Title VII [of the Civil Rights Act of 1964] forbids." The criteria were found to have no reasonable "job relation" against the state's insistence that they insured the necessary "strength"; at least two of the justices had concluded that prison guards "rely primarily on the moral authority of their office . . . ." On the oth-

er hand, another division of the court held the discriminatory regulation against female guards in male maximum-security prisons to be constitutionally and statutorily acceptable as a "'bona fide occupational qualification . . . .'"

*Firefighters Institute* v. *City of St. Louis, Mo.* (8th Cir. 1978) 588 F.2d 235 (cert. den. *sub nom. Banta* v. *Firefighters Institute* (1979) 443 U.S. 904 [61 L.Ed.2d 872, 99 S.Ct. 3096]).

Here, as in the case at bench, black fire fighters and others claimed racial discrimination against blacks in the hiring, and promotion, of personnel of a city's fire department. A remedial action for its correction was commenced under title VII of the Civil Rights Act of 1964. The district court had observed long-existing discriminatory patterns by the city, against blacks, in employment and promotion as fire fighters. Such discrimination had continued even up to the time of the action's trial.

On review the court of appeals found that the fire department's tests and examinations for initial employment, and promotion, had a substantial disparate racial effect, which the city had *never* endeavored to correct. The city's conduct through the preceding years was described as "intransigence" and "unwillingness," a "determination" not to change conditions, "recalcitrance," "continued inaction," and a present-day "continuation of a policy of discrimination" against blacks. Such practices were emphasized by the city's permissive and continued maintenance of "racially segregated eating arrangements" in its firehouses.

The court concluded: "We believe that the record in this case . . . provides ample justification for preferential relief . . . in order to redress the rights of those who have been the victims of the City's discrimination." (Pp. 240-241.)

As will be hereinafter seen, the City of Oakland had long since put an end to its historical discrimination in the hiring and promotion .practices of its fire department. It has in good faith endeavored to ameliorate and overcome the bitter effects of that discrimination. And its endeavor has been met with substantial, and ever increasing, success. (See pp. 355-357, *infra.*) We have found no evidence and observe no responsible argument to the contrary. Nor did the superior court find any intentional or purposeful present-day discrimination.

No authority has been offered, nor has any been found by us, holding that a *public entity* such as the City of Oakland, endeavoring in good faith to overcome the effects of past racial discrimination, will be subjected to judicial imposition of minority person quotas in its hiring and promotion of employees. *Price* v. *Civil Service Com., supra*, 26 Cal.3d 257, is inapposite for there, as has been seen, the city itself had reluctantly imposed such quotas, in its affirmative action efforts, upon its uncooperative department head. The high court had simply sanctioned the city's own efforts. And *Firefighters Institute* v. *City of St. Louis, Mo., supra*, 588 F.2d 235, is patently inapplicable here, for there the city's continuing bad faith left no rational judicial alternative to mandatory correction.

We have also considered the recent United States Supreme Court authority of *Fullilove* v. *Klutznick* (1980) 448 U.S. 448 [65 L.Ed.2d 902, 100 S.Ct. 2758]. There the high court found no constitutional fault in the federal government's effort to increase minority business enterprise participation in certain federally subsidized public works projects by requiring prime contractors, absent administrative waivers and upon certain conditions, to allocate 10 percent of their contracts' federal funds to such minority business enterprises. As in *Price* v. *Civil Service Com., supra*, 26 Cal.3d 257, the court affirmed the government's attempt to ameliorate minority underrepresentation resulting from its own past practices or inaction.

At the cost of some later repetition we quote from high relevant authority:

"Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." (*Hazelwood School District* v. *United States* (1977) 433 U.S. 299, 309 [53 L.Ed.2d 768, 778, 97 S.Ct. 2736].)

"[W]e think the District Court correctly held that the affirmative efforts of the Metropolitan Police Department to recruit black officers, the changing racial composition of the recruit classes and of the force in general, and the relationship of the test to the training program negated

any inference that the Department discriminated on the basis of race or that 'a police officer qualifies on the color of his skin rather than ability.'" (*Washington* v. *Davis* (1976) 426 U.S. 229, 246 [48 L.Ed.2d 597, 611, 96 S.Ct. 2040].)

Racial discrimination practiced before the Civil Rights Act's 1972 amendment "is merely an unfortunate event in history which has no present legal consequences.... [T]he critical question is whether any present *violation* exists." (*United Air Lines, Inc.* v. *Evans* (1977) 431 U.S. 553, 558 [52 L.Ed.2d 571, 578, 97 S.Ct. 1885].)

"[A] court must ... be mindful that remedies for the continuing effects of past discrimination have proven distressingly elusive, and that it is therefore important that entities attempting in good faith to promote integration be given reasonable leeway in experimenting with various methods to achieve this compelling societal objective." (*Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34, 81 [132 Cal.Rptr. 680, 553 P.2d 1152], quoting from unchallenged portion of Justice Tobriner's dissent.)

In *Dothard* v. *Rawlinson, supra,* 433 U.S. 321, the high court found no prison guard "job relation" to a state's "height and weight" requirements. In the case at bench we observe a critical fire fighter "job relation" to the City of Oakland's height and weight requirement for such employment. (See pp. 373-374, *infra.*) That case also, is of no assistance to us.

To what we have heretofore said, we now respectfully add our opinion and decision, as earlier filed.

The issue tendered us on these appeals is whether the Fourteenth Amendment,[1] and the Civil Rights Act of 1964 (tit. VII),[2] permit the State of California, or its courts, to discriminate against nonminority

---

[1]"No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

[2]"It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire ... or otherwise to discriminate against any individual with respect to ... terms, conditions or privileges of employment, because of such individual's race, color ... or national origin; ..." (42 U.S.C. § 2000e-2(a)(1).)

"... Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." (*Dothard* v. *Rawlinson, supra,* 433 U.S. 321, 331-332, fn. 14 [53 L.Ed.2d 786, 799, 97 S.Ct. 2720, 2728].)

persons (Caucasians),[3] who themselves are individually without fault, on the basis of race alone, in order to ameliorate the effects of past racial discrimination against minority persons generally.

"No one denies the regrettable fact that there has been societal discrimination in this country against various racial and ethnic groups." (*University of California Regents* v. *Bakke, supra*, 438 U.S. 265, 296, fn. 36 [57 L.Ed.2d 750, 775, 98 S.Ct. 2733, 2752].) It constitutes "'an unfortunate and ignominious page in this country's history.'" (*Albemarle Paper Co.* v. *Moody* (1975) 422 U.S. 405, 418 [45 L.Ed.2d 280, 297, 95 S.Ct. 2362].)

The Fire Department of the City of Oakland (City) has not gone untouched by such practices. Like many fire departments throughout the state and nation it has a shameful *historical* record of racial discrimination in the employment and promotion of fire fighters. The origin is obscure and subtle, and the blame may be widely spread. Some of it, such as separate dining facilities and sleeping quarters for the races, will probably be traced to the high judicial approval of *Plessy* v. *Ferguson* (1896) 163 U.S. 537 [41 L.Ed.2d 256, 16 S.Ct. 1138].

But the record before us uncontrovertibly establishes that over the last decade and well beyond, the City has in good faith engaged in a well-funded and "monumental" effort to recruit minority persons as fire fighters. "Goals" and "targets" have been set for achieving such a "racial and ethnic makeup of personnel in all job categories [as] will bear a 'reasonable ratio balance' to the racial and ethnic composition of the population of Oakland; ..." The campaign, mainly through the "mass media," had produced many well-qualified minority person fire fighters. But the progress had been slow, for new appointments and promotions to higher rank will ordinarily depend upon vacancies caused by retirement and death. And as pointed out in the superior court, "where the salary is way above that of an average high school graduate [the City's efforts generated interest among persons] who had never been interested before, and who are not capable of performing, in no way." Such persons were unfortunately, but necessarily, eliminated in the civil service competition for fire fighter jobs.

The current good faith of the City is manifest. It was demonstrated, perhaps overdemonstrated, by the most recent oral examination for

---

[3]We shall use this term as it was generally used in the superior court.

"hoseman" (the entering class of fire fighter) candidates; there "29% of the Caucasians failed, 21% of the Blacks failed, none of the Spanish-surnamed individuals failed, 20% of the Asians failed, and 33% [1 out of 3] of the American Indians failed; . . ."

The results of the last entrance examinations prior to the commencement of plaintiffs' action are particularly notable. In order of the candidates' passing grades, the first was a minority person. Of the first 30, 16 were minority persons. And of the next 70 passing grades, the "candidates broke down ethnically almost 50-50 . . . ." Thus, minority persons constituted about 51 percent of the group first to be called, a ratio precisely the same as the estimated proportion of minority persons in the City's population. Each of these successful candidates had passed the fire department's prescribed written and oral examinations, physical agility tests, and height and weight criteria.

Thereafter a group of black minority persons and the Oakland Black Fire Fighters Association commenced the instant class action in mandate against the City. They contended principally (1) that the percentage of minority persons in all job levels of the fire department bore no reasonable relationship to their percentage in the population of the City, and (2) that the required examinations, tests and standards "do not substantially relate to the performance of firefighting duties." They sought a writ of mandate calculated to "dissipate the effect of [the fire department's] *history* of discriminatory hiring and promotion . . . ." (Italics added.)

Caucasians who were fire fighters, or who had qualified for such jobs by civil service examinations, or who aspired to hold such jobs, joined with the City as interveners in defense of plaintiffs' action. They contended that their employment or promotion chances would be lost or jeopardized by the affirmative relief sought by plaintiffs.

Each of the respective sides relied principally upon the Fourteenth Amendment's "equal protection" clause and the Civil Rights Act of 1964 (hereafter sometimes Civil Rights Act). (See fns. 1 and 2, *ante.*) Plaintiffs argued that those high mandates authorized, and *compelled*, "affirmative relief" in order to compensate for the fire department's historical job and promotion discrimination against minority persons generally. The City and the interveners contended that the affirmative relief sought would itself discriminate against Caucasians bearing no re-

sponsibility for plaintiffs' grievances, solely on account of their race. This, they insisted, was *forbidden* by the Fourteenth Amendment and by the Civil Rights Act.

The City and the Caucasian interveners, lacking knowledge of what form, if any, of affirmative relief would be granted by the superior court, did not expressly plead the Civil Rights Act as a defense to the action. But implicit, indeed explicit, in the record is their reliance, in part, upon that statute. Furthermore, the relevant facts being uncontroverted, and the issue having been fully briefed and argued, the question is one of law such as may always be considered on appeal, even if not raised below. (*Century Bank* v. *St. Paul Fire & Marine Ins. Co.* (1971) 4 Cal.3d 319, 324 [93 Cal.Rptr. 569, 482 P.2d 193]; *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

Following a trial the superior court concluded that *"in order to ameliorate the effect of past discriminatory practices"* (italics added) by the fire department, "affirmative relief is necessary." The affirmative relief decreed by the ensuing judgment follows: "In order to ameliorate the effects of past racial discrimination, appointment of fire fighters ... shall [for 5 years] be at the rate of at least two racial minorities for each Caucasian .... In order to ameliorate the effects of past racial discrimination, promotion of fire fighters for ... five years shall be at the rate of at least one racial minority for five Caucasians."

The superior court also found that each, and all, of the fire department's written examinations, physical agility tests, height and weight standards, and the "time in grade requirements and seniority weighting" in respect of promotions, were invalid. Their invalidity was based upon (1) the need "to ameliorate the effects of past racial discrimination," (2) their "racially disparate impact" upon minority persons, and (3) their lack of "job relation." The judgment accordingly, and effectively, invalidated the several requirements and ordered minority persons to be accepted for employment, or promoted, in accordance with the judicially established "quotas" upon passing an oral examination alone.

It is proper here to emphasize that the superior court made no finding—and the evidence would not reasonably permit such a finding—that in its campaign to enlist minority person fire fighters, or in its examinations, tests and other employment criteria, or their administra-

tion, the City had acted in bad faith, or with a purpose or intent to discriminate, or otherwise than to achieve a racially balanced fire department consisting of persons properly qualified for their respective jobs.

The City and the interveners vigorously (and correctly) point out that the Caucasians whose job or promotion opportunities are lessened or frustrated by the judgment, bear no personal blame for the past racial discrimination found by the superior court. They also, with record justification, point to the lack of evidence or findings that any of the named plaintiffs or members of the class represented by them, had personally been victimized by such past racial discrimination. Their arguments may reasonably be condensed to the contention that the Fourteenth Amendment and the Civil Rights Act proscribe the judgment's discrimination *on account of race alone*, against such Caucasians as were found better qualified for fire fighter jobs and promotion, by fairly administered civil service examinations, tests and standards.

■ Before entering upon our consideration of these issues, we dispose of an insistent contention of the City and the interveners that plaintiffs' action must be dismissed for their failure to exhaust certain administrative remedies provided by California's Fair Employment Practice Act (Lab. Code, § 1410 et seq.) and by the Civil Rights Act.[4] We decline to pass upon this issue, other than to say that persons in the position of plaintiffs would be well advised to consider such matters before entering upon litigation such as this. Here the case has already been litigated for several years. Its prompt determination is not only in the public interest, but it would also end what must be grave uncertainty in the lives and careers of the many persons, minority and Caucasian, who will be affected by its outcome.

We observe that the doctrine of exhaustion of administrative remedies is not an inflexible rule. (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761].) It will not be asserted where it disserves the public interest (*Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 114 [122 Cal.Rptr. 282]), or where irreparable injury would otherwise occur (*Associated Cal. Loggers, Inc.* v. *Kinder* (1978) 79 Cal.App.3d 34, 43 [144

---

[4]The superior court denied plaintiffs any relief under the Civil Rights Act; we are told by the parties that it was because of plaintiffs' failure to exhaust the administrative remedies provided by that act.

Cal.Rptr. 786]), or where, as here contended by plaintiffs, the administrative remedy would be futile (*In re Serna* (1978) 76 Cal.App.3d 1010, 1014 [143 Cal.Rptr. 350]), or inadequate (*Bennett* v. *Borden, Inc.* (1976) 56 Cal.App.3d 706, 709 [128 Cal.Rptr. 627]).

Another threshold question appears. It concerns the respective coverage of the racial discrimination provisions, and implications, of the Civil Rights Act and the Fourteenth Amendment. There is much difference of opinion. Some insist that the act, based upon powers expressly confided to Congress by the Constitution, extends the limit of its proscriptions beyond that of the Fourteenth Amendment. Others hold that the coverage of the act is coextensive with that of the Fourteenth Amendment. The controversy may be pointed up, as follows.

In *University of California Regents* v. *Bakke, supra,* 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733], five of the justices (one of the majority and the four dissenters) held that title VI of the Civil Rights Act "proscribes only those racial classifications that would violate the Equal Protection Clause if employed by a State or its agencies." (438 U.S., p.267 [57 L.Ed.2d, p. 758, 98 S.Ct., p. 2737].) The remaining four justices of the majority held the Civil Rights Act to be a "distinct statutory prohibition," and not "simply . . . a constitutional appendage." (438 U.S., p. 418 [57 L.Ed.2d, p. 851, 98 S.Ct., p. 2813].) Earlier a majority of the same court had stated: "We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII [Civil Rights Act], and we decline to do so today." (*Washington* v. *Davis, supra,* 426 U.S. 229, 239 [48 L.Ed.2d 597, 607].) But a principal proponent of the Civil Rights Act, Senator Humphrey, arguing in Congress for its passage, had declared: "'As I have said, the bill has a simple purpose. That purpose is to give fellow citizens—Negroes—the same rights and opportunities that white people take for granted. . . . *It is no more than what our Constitution guarantees.*'" (Italics added; see *University of California Regents* v. *Bakke, supra,* 438 U.S. 265, 287 [57 L.Ed.2d 750, 769, 98 S.Ct. 2733, 2746].)[5]

As will hereafter appear, finding it unnecessary to our resolution of the appeal we do not pass upon this unresolved issue.

---

[5]No distinction may reasonably be made, and we find no judicial distinction to have been made, in the instant context between the Civil Rights Act's title VII (see fn. 2, *ante*), and its title VI prohibiting racial discrimination "under any program or activity receiving Federal financial assistance." (42 U.S.C. § 2000d.)

We proceed to our inquiry whether the Fourteenth Amendment and the Civil Rights Act permit the sort of discrimination, on racial grounds, here complained of by the City and the interveners.

We find a wealth of lesser judicial pronouncements which are often inconsistent and sometimes confusing. (See, e.g., annots. to U.S.C.A. Const. Amend. 14, § 1, and 42 U.S.C.A. §§ 2000e-2000e-5.) And much has otherwise been written on the subject, disclosing broad disagreement on the related moral and policy considerations. (See *Bakke v. Regents of University of California, supra*, 18 Cal.3d 34, 45.)

We shall not add our voice to the debate, but shall instead rely upon the following authoritative judicial rationale and holdings of the state's and nation's highest courts.

*Hazelwood School District* v. *United States, supra*, 433 U.S. 299. "'[I]t is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.'" (P. 307 [53 L.Ed.2d at p. 777].)

■ "Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. *A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes.*" (P. 309 [53 L.Ed.2d at p. 778]; italics added.)

*Albemarle Paper Co.* v. *Moody, supra*, 422 U.S. 405, 421 [45 L.Ed.2d 280, 298].

■ "'[The Civil Rights] Act is intended to make the victims of unlawful discrimination whole, and ... the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that *persons aggrieved* by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.'" (Italics added.)

(As will hereafter be seen, the "persons aggrieved" of this authority are the "individual" victims of racial discrimination, and not members

generally of the race which was previously the object of such discrimination.)

*McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273, 278-280 [49 L.Ed.2d 493, 499-501, 96 S.Ct. 2574]. "Title VII of the Civil Rights Act of 1964 prohibits the discharge of 'any individual' because of 'such individual's race,' ... Its terms are not limited to discrimination against members of any particular race.... [The Equal Employment Opportunity Commission] whose interpretations are entitled to great deference ... has consistently interpreted Title VII to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites, holding that to proceed otherwise would 'constitute a derogation of the Commission's Congressional mandate to eliminate all practices which operate to disadvantage the employment opportunities of any group protected by Title VII, including Caucasians.' ... This conclusion is in accord with uncontradicted legislative history to the effect that *Title VII was intended to 'cover white men and white women and all Americans,' ... and create an 'obligation not to discriminate against whites,' ... We therefore hold today that Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes and Jackson white.*" (Fns. omitted; italics added.)

*Franks* v. *Bowman Transp. Co., Inc.* (1976) 424 U.S. 747 [47 L.Ed.2d 444, 96 S.Ct. 1251].

Plaintiffs appear to place their principal reliance upon this authority. They say: "In *Franks* v. *Bowman Trucking* (1976) 424 U.S. 747, the United States Supreme Court made clear that trial courts should be flexible in exercising their equitable powers to 'make whole' the victims of past employment discrimination and to eradicate discrimination in the future. The Court also emphasized that the burden of past discriminatory hiring practices should be shared by all of the employees. The Court stated, 'If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.'"

The court's holding is misunderstood. It was held that certain "identifiable" black employees of a trucking company whose applications for better jobs had long before been denied on account of their race were

entitled, under the Civil Rights Act, to affirmative relief giving them employment benefits they would have enjoyed except for the earlier racial discrimination. In such a case they were simply placed in the "favorable positions" they should have held, and no Caucasian employed after the discrimination had a rational grievance when displaced from a preferred position to which he was legally unentitled. The case did not concern, nor was relief granted for, preferential treatment of blacks generally (as here contended for) who had never been employed by the trucking company. The case lends no aid to plaintiffs.

*Teamsters* v. *United States* (1977) 431 U.S. 324 [52 L.Ed.2d 396, 97 S.Ct. 1843].

This case followed and elaborated upon *Franks* v. *Bowman Transp. Co., Inc., supra,* 424 U.S. 747. Another transportation company and a labor union had earlier discriminated against qualified racial minority members in the more desirable jobs of "line drivers." The subjects of discrimination were of three classes: (1) minority company employees who had been denied transfers to the better jobs; (2) minority persons who had unsuccessfully applied for work as line drivers; and (3) minority persons who would have applied for such jobs but did not do so on account of the "knowledge [of each] that the job he wanted was unavailable to him" because of the patent discriminatory practices.

Under the Civil Rights Act the government sued the company and union for "specific 'make whole' relief for individual discriminatees,..."

In its review of the lower court's judgment the high court appeared to encounter no difficulty in concluding that the minority members of the first two categories, who had actually applied for line drivers' jobs, were entitled to the affirmative relief of being "made whole." Subsequent successful Caucasian job applicants claiming prejudice or discrimination against themselves had no reasonable complaint because as to them, the minority members were simply placed in the preferred "rightful position" they would have held except for the past racial discrimination against them.

It was the third classification, those qualified minority persons who would have applied for line drivers' jobs, but were discouraged therefrom by the company's and union's practices, to which the court devoted most of its consideration. On this issue the court said (431 U.S., pp. 363, 365-366, 367-368, 371 [52 L.Ed.2d, pp. 433, 434, 435,

437]): "The question whether seniority relief may be awarded to [the earlier] nonapplicants was left open by our decision in [*Franks v. Bowman Transp. Co., Inc.*], since the class at issue in that case was limited to 'identifiable applicants who were denied employment ....'" (P. 363 [52 L.Ed.2d, pp. 432-433].) "When a person's desire for a job is not translated into a formal application solely because of his unwilling-ness to engage in a futile gesture he is as much a victim of dis-crimination as is he who goes through the motions of submitting an application." (Pp. 365-366 [52 L.Ed.2d, p. 434].)

"The denial of Title VII [Civil Rights Act] relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimi-nation. Victims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups.... [¶] To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonappli-cants are always entitled to such relief. *A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy bur-den of proving that he would have applied for the job had it not been for those practices.... When this burden is met, the nonapplicant is in a position analogous to that of an applicant ....*" (Pp. 367-368 [52 L.Ed.2d, p. 435]; italics added.)

"*While it may be true that many of the nonapplicant employees de-sired and would have applied for line-driver jobs but for their knowledge of the company's policy of discrimination, the Government must carry its burden of proof, with respect to each specific individual,* ..." (P. 371 [52 L.Ed.2d, p. 437]; italics added.)

It thus becomes clear that minority persons are entitled to affirmative relief, or to be "made whole," under the Civil Rights Act only as to those who had *individually* been the subject of earlier, or historical, job discrimination. In the case at bench, as noted, there was neither evi-dence, nor contention, that any of the named plaintiffs, or of the class of minority persons represented by them, was a victim of the fire de-partment's earlier racial discrimination.

*Washington* v. *Davis, supra*, 426 U.S. 229. A group of black persons, including police officers, of the nation's capital, had commenced an action for "affirmative relief," complaining that the police department's entrance requirements were racially discriminatory. Particularly complained of was "a written personnel test which excluded a disproportionately high number of Negro applicants." (P. 233 [48 L.Ed.2d, p. 603].)

The trial court had noted "that there was no claim of 'an intentional discrimination or purposeful discriminatory acts' but only a claim that [the written test] bore no relationship to job performance and 'has a highly discriminatory impact in screening out black candidates.'" (P. 235 [48 L.Ed.2d, P. 604].) The evidence indicated that the number of black police officers, while substantial, was not proportionate to the city's population mix, and that a higher percentage of blacks failed the test than Caucasians. "Since August 1969, 44% of new police force recruits had been black; that figure also represented the proportion of blacks on the total force and was roughly equivalent to 20- to 29-year-old blacks in the 50-mile radius in which the recruiting efforts of the Police Department had been concentrated. It was undisputed that the Department had systematically and affirmatively sought to enroll black officers. . . . The District Court ultimately concluded that '[t]he proof is wholly lacking that a police officer qualifies on the color of his skin rather than ability' and that the Department 'should not be required on this showing to lower standards or to abandon efforts to achieve excellence.'" (Pp. 235, 236 [48 L.Ed.2d, pp. 604, 605].)

No constitutional fault was found and the plaintiffs were denied any affirmative, or other, relief.

It may properly be emphasized here that in the district court no contention was made, and no evidence indicated, that the city in its police recruitment and promotion practices had the *intent* or *purpose* to discriminate against racial minorities.

On review the United States Supreme Court expressed itself in the following manner: "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection compo-

nent prohibiting the United States from invidiously discriminating between individuals or groups. . . . But *our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact.*" (P. 239 [48 L.Ed.2d, p. 607]; italics added.)

"[W]e have [never] held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. *Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.*" (P. 242 [48 L.Ed.2d, p. 609]; italics added.)

"*[T]o the extent that [certain cited] cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement.* [¶] *As an initial matter, we have difficulty understanding how a law establishing a racially neutral qualification for employment is nevertheless racially discriminatory and denies 'any person . . . equal protection of the laws' simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups. . . .; and it is untenable that the Constitution prevents the Government from seeking modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence,* particularly where the job requires special ability to communicate orally and in writing. *Respondents, as Negroes, could no more successfully claim that the test denied them equal protection than could white applicants who also failed.*" (Pp. 245-246 [48 L.Ed.2d, pp. 610-611]; italics added.)

"*[W]e think the District Court correctly held that the affirmative efforts of the Metropolitan Police Department to recruit black officers, the changing racial composition of the recruit classes and of the force in general, and the relationship of the test to the training program negated any inference that the Department discriminated on the basis of race* or that 'a police officer qualifies on the color of his skin rather than ability.'" (P. 246 [48 L.Ed.2d, p. 611]; italics added.)

Affirming the trial court, the high tribunal found no "equal protection" or other constitutional, or statutory, abridgment.

It then stated: "If there are now deficiencies in the recruiting practices under prevailing Title VII standards, those deficiencies are to be directly addressed in accordance with appropriate procedures mandated under [the Civil Rights Act]." (P. 252 [48 L.Ed.2d, 614].)

*Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424 [28 L.Ed.2d 158, 91 S.Ct. 849]. ■ "[The Civil Rights Act] authorizes the use of 'any professionally developed ability test' that is not 'designed, intended *or used* to discriminate because of race ...." (P. 433 [28 L.Ed.2d, p. 165].)

"Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. *Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract.*" (P. 436 [28 L.Ed.2d, p. 167]; italics added.)

*Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441]. "The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights.... Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." (P. 22, fn. omitted [92 L.Ed., p. 1185].)

*Bakke* v. *Regents of University of California, supra,* 18 Cal.3d 34. In this case the United States Supreme Court granted certiorari and thereafter affirmed, but by a divided court and to some extent upon a different rationale. To the extent that the opinions of the two courts are not out of harmony, we deem ourselves bound also by the California authority. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Although the case concerned racial discrimination as to educational opportunities in a federally subsidized university, its factual substance is otherwise closely akin to ours. The university had chosen to allocate 16 of 100 places in its entering medical class to minority persons. This resulted in the rejection of better qualified Caucasians, including Bakke. The California high court found the "quota" allocation to be inimical to Fourteenth Amendment standards. For our purposes, its unrejected reasoning and holding may fairly be condensed as follows (18 Cal.3d, pp. 49-63): "Classification by race is subject to strict scrutiny, at least where the classification results in detriment to a person because of his race." (P. 49.)

*"We cannot agree with the proposition that deprivation based upon race is subject to a less demanding standard of review under the Fourteenth Amendment if the race discriminated against is the majority rather than a minority. We have found no case so holding, and we do not hesitate to reject the notion that racial discrimination may be more easily justified against one race than another, . . ."* (P. 50; italics added, fn. omitted.)

"Regardless of its historical origin, the equal protection clause by its literal terms applies to 'any person,' and its lofty purpose, to secure equality of treatment to all, is incompatible with the premise that some races may be afforded a higher degree of protection against unequal treatment than others." (P. 51; fn. omitted.)

*"[N]o applicant may be rejected because of his race, in favor of another who is less qualified, as measured by standards applied without regard to race."* (P. 55; italics added.)

"[Lower] federal courts, with one exception, have held that the *preferential treatment of minorities in employment is invalid on the ground that it deprives a member of the majority of a benefit because of his race."* (Pp. 57-58; italics added.)

"[T]here are . . . forceful policy reasons against preferential admissions based on race. The divisive effect of such preferences needs no explication and raises serious doubts whether the advantages obtained by the few preferred are worth the inevitable cost to racial harmony. The overemphasis upon race as a criterion will undoubtedly be counterproductive: rewards and penalties, achievements and failures, are likely

to be considered in a racial context through the school years and beyond. Pragmatic problems are certain to arise in identifying groups which should be preferred or in specifying their numbers, and preferences once established will be difficult to alter or abolish; human nature suggests a preferred minority will be no more willing than others to relinquish an advantage once it is bestowed. Perhaps most important, the principle that the Constitution sanctions racial discrimination against a race—any race—is a dangerous concept fraught with potential for misuse in situations which involve far less laudable objectives than are manifest in the present case." (Pp. 61-62; fn. omitted.)

"*[A] quota becomes no less offensive when it serves to exclude a racial majority. 'No form of discrimination should be opposed more vigorously than the quota system.'*... [¶] To uphold the University would call for the sacrifice of principle for the sake of dubious expediency and would represent a retreat in the struggle to assure that each man and woman shall be judged on the basis of individual merit alone, a struggle which has only lately achieved success in removing legal barriers to racial equality. *The safest course, the one most consistent with the fundamental interests of all races and with the design of the Constitution, is to hold, as we do, that the special admission program is unconstitutional because it violates the rights guaranteed to the majority by the equal protection clause of the Fourteenth Amendment of the United States Constitution.*" (Pp. 62-63; italics added, fn. omitted.)

We also consider here the dissent of Justice Tobriner (18 Cal.3d, pp. 64, 83-88, and fns. 11, 12). Although in sharp disagreement with much of the majority opinion, he made it clear that he spoke in the context of a university's special problems. He pointed up the need of such an institution "to provide a diverse, integrated student body in which *all* medical students might learn to interact with and appreciate the problems of all races" (p. 85), and that "cultural bias [is] implicit in the traditional academic admission criteria" (p. 83, fn. 12). The school's "quota" applicants, he said, (unlike the case before us) were found no "less qualified than rejected white applicants *under the medical school's own standards.*" (P. 83, fn. 11.) And the justice opined that "a court must ... be mindful that remedies for the continuing effects of past discrimination have proven distressingly elusive, and that *it is therefore important that entities attempting in good faith to promote integration be given reasonable leeway in experimenting with various methods to achieve this compelling societal objective.*" (P. 81; italics added.)

We are of the opinion that the dissent also lends rational support to the contentions of the City and the interveners of the case at bench.

*University of California Regents* v. *Bakke, supra*, 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]. This authority, as heretofore noted, affirmed California's *Bakke* v. *Regents of University of California.* Justice Powell found the school's "quota," and the rejection of Bakke on account of his race, to be violative of the Fourteenth Amendment. Four other justices found it unnecessary to reach the constitutional issue, for title VI (see fn. 5, *ante*) of the Civil Rights Act was found to bar the university's "quota" and the reverse racial discrimination against Bakke.

The case is thus clear authority that a minority person "quota" provision having the effect of discriminating against faultless Caucasians on the basis of race alone is unlawful.

*DeFunis* v. *Odegaard, supra*, 416 U.S. 312. This case, like *Bakke*, concerned a university's exclusion of a qualified Caucasian student, because of a "quota" giving preference to lesser qualified minority persons. The high court, finding mootness, declined to consider the substantive constitutional issues tendered by the parties.

But Justice Douglas, in what he termed "a dissent," nevertheless addressed himself to those issues, and the rest of the court expressed no disagreement. His comments have been widely quoted, and it is noted that they were relied upon in part by Justice Powell in *University of California Regents* v. *Bakke*, and in the majority opinion of California's *Bakke* v. *Regents of University of California.* Although lacking precedential authority, they receive our respectful consideration. We note the following:

"'The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States.'" "Minorities in our midst who are to serve actively in our public affairs should be chosen on talent and character alone, . . ." (416 U.S., p. 334 [40 L.Ed.2d, p. 179].)

"*There is no constitutional right for any race to be preferred.* The years of slavery did more than retard the progress of Blacks. Even a greater wrong was done the whites by creating arrogance instead of humility and by encouraging the growth of the fiction of a superior race.

There is no superior person by constitutional standards. *A DeFunis who is white is entitled to no advantage by reason of that fact; nor is he subject to any disability, no matter what his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner.*" (*Id.,* pp. 336-337 [40 L.Ed.2d, p. 180]; italics added.)

"*The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized.*" (*Id.,* p. 342 [40 L.Ed.2d, p. 183]; italics added.)

█ We turn our consideration now to that portion of the superior court's judgment granting "*affirmative relief*" to the named and class plaintiffs "[i]n order to ameliorate the effects of past racial discrimination, . . . "

As pointed out, none of them had "individually" been so discriminated against by the City or its fire department. Under the clear authority of the United States Supreme Court such affirmative relief was not available to them for the reason that their races generally, at other times, had been the objects of such discrimination. (See *Teamsters* v. *United States, supra,* 431 U.S. 324 [52 L.Ed.2d 396]; *Franks* v. *Bowman Transp. Co., Inc., supra,* 424 U.S. 747; *Albemarle Paper Co.* v. *Moody, supra,* 422 U.S. 405, 421 [45 L.Ed.2d 280, 298-299].) And such affirmative relief will not be permitted against a public employer which, as here and insofar as the named plaintiffs and their class are concerned, had entertained neither *intent* nor *purpose* to discriminate and had in good faith been endeavoring itself to ameliorate the effects of past discrimination. (See *Hazelwood School District* v. *United States, supra,* 433 U.S. 299; *Washington* v. *Davis, supra,* 426 U.S. 229.)

The "quota" provisions of the judgment are found by us to be in contravention of the Fourteenth Amendment and of the Civil Rights Act of 1964. They unlawfully discriminate against Caucasian persons on account of their race alone. (See *Bakke* v. *Regents of University of California, supra,* 18 Cal.3d 34; *University of California Regents* v. *Bakke, supra,* 438 U.S. 265; *McDonald* v. *Santa Fe Trail Transp. Co., supra,* 427 U.S. 273; *Shelley* v. *Kraemer, supra,* 334 U.S. 1, 22 [92 L.Ed. 1161, 1185-1186]; *DeFunis* v. *Odegaard, supra,* 416 U.S. 312, 320 [40 L.Ed.2d 164, 171] [dis. opn. of Justice Douglas].)

■ There remains for our consideration the portion of the superior court's judgment nullifying the fire department's written examinations, physical agility tests, height and weight requirements, and the "time in grade requirements and seniority weighting" in respect of promotions. These provisions, it will be recalled, were based upon the need "to ameliorate the effect of past discriminatory practices" *and* the fact of their "racially disparate impact" and "lack of job relation."

■ Insofar as such segments of the judgment are based upon the need "to ameliorate the effect of past discriminatory practices," for the reasons stated in relation to the "quota" provisions of the judgment we find them also to be invalid.

■ But we give continued attention to the superior court's conclusions of racially disproportionate impact and lack of job relation. Such conclusions, although sometimes referred to as "findings of fact" by the superior court, are not binding upon us.

"Determination of what happened requires assessments of the relative credibility of witnesses whose stories ... are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford." (*Culombe* v. *Connecticut* (1961) 367 U.S. 568, 603 [6 L.Ed.2d 1037, 1058, 81 S.Ct. 1860].) But on issues such as those now before us, a reviewing court has something of a transcendent fact-finding duty. "'[I]ssue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication." (*Watts* v. *Indiana* (1949) 338 U.S. 49, 51 [93 L.Ed. 1801, 1804, 69 S.Ct. 1347].) Under these criteria we are required to review the superior court's instant "conclusions."

We consider first the conclusion that the City's fire department's examinations, tests, and other employment criteria have a "racially disparate impact."

It is again observed that of the first 100 persons on the City's fire department's latest civil service entrance list to be called for employment,

minority persons comprised 51 percent, i.e., the same proportion they bore to the whole of the City's population. We are unable to conclude that such a result is reasonably reconcilable with the racially disproportionate impact contended by plaintiffs, and found by the superior court.

Nor, at least in the context of the case at bench, where the plaintiff minority persons are all black, may it reasonably be said that the fire department's "physical agility test," and minimum "height and weight requirement" (5 ft., 6 in., and 140 lbs.), have such a racially disproportionate impact.

But as we have by now repetitiously pointed out, the City's avowed, and implemented, purpose and intent for many years had been to end racial imbalance in its fire department, and itself "to ameliorate the effects of past racial discrimination,..." Were we to assume, arguendo, the racially disproportionate impact found by the superior court, there would then be such impact *alone*, without intent or purpose to discriminate. In such a case the extreme sanctions here imposed by the superior court are without Fourteenth Amendment or Civil Rights Act, or other, lawful justification.

*Griggs* v. *Duke Power Co., supra*, 401 U.S. 424, 433 [28 L.Ed.2d 158, 165], as noted, holds that: "[*The Civil Rights Act*] authorizes the use of 'any professionally developed ability test' that is not 'designed, intended *or used* to discriminate because of race ....'"

*Washington* v. *Davis, supra*, 426 U.S. 229, appears to be the controlling *Fourteenth Amendment* authority on the immediate issue. In that case, as above noted and as in the case at hand, there was no "'intentional discrimination or purposeful discriminatory acts,'" but instead a claim that a police department employment test had "'a highly discriminatory impact in screening out black candidates.'" (P. 235 [48 L.Ed.2d, p. 604].) Giving effect, arguendo, to that claim the high court found no Fourteenth Amendment or other abridgment. We repeat, for emphasis, some of its conclusions:

"[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." (P. 239 [48 L.Ed.2d, p. 607].) "[W]e have

not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." (P. 242 [48 L.Ed.2d, p. 609].) "[I]t is untenable that the Constitution prevents the Government from seeking modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence, particularly where the job requires special ability to communicate orally and in writing. Respondents, as Negroes, could no more successfully claim that the test denied them equal protection than could white applicants who also failed." (Pp. 245-246 [48 L.Ed.2d, p. 611].)

Under this authority the City had committed neither Civil Rights Act, nor Fourteenth Amendment, violation in respect of the claim of racially discriminatory impact of its fire fighter employment tests, examinations, and other employment criteria.

We pass on to the remaining contention of plaintiffs, and the superior court's conclusion, of "lack of job relation."

As we have pointed out, *Griggs* v. *Duke Power Co., supra,* 401 U.S. 424, 436 [28 L.Ed.2d 158, 167], requiring such a job relation in employment tests, stated that such tests must demonstrably be "a reasonable measure of job performance," in order to pass constitutional and statutory muster.

Here also we conclude that certain of the plaintiffs',contentions, and the superior court's conclusions, are not reasonably supported. In part they relate to the "physical agility test." A fire fighter job applicant was required to carry a dummy on a ladder and to do "two pullups." One of the named plaintiffs, weighing 292 pounds, failed in the latter exercise and was eliminated as a fire fighter candidate. He was ordered reinstated upon passing an oral examination. Heavy reliance was and is placed upon evidence that a fire fighter spends only a small part of his time actually handling hoses and ladders and other heavy equipment, or rescuing persons or animals, or breaking through roofs or walls or doors, or performing other arduous duties of his employment. A similarly unpersuasive argument was answered by the court of *Smith* v. *Troyan* (6th Cir. 1975) 520 F.2d 492, 496 (cert. den., 426 U.S. 934 [49 L.Ed.2d 385, 96 S.Ct. 2646]), in this manner: "That an occupational

function consumes a *de minimis* proportion of one's workday ... does not necessarily diminish the need for selecting one who can best perform that function. A lifeguard may well spend all but fifteen minutes of an entire summer observing swimmers and keeping the beach free of litter, but in those fifteen minutes swimming ability to rescue a drowning swimmer becomes vitally crucial." We find the physical agility test to have an appropriate "job relation."

We are also impelled to question the factual validity of the superior court's determination that "time in grade requirements and seniority factor" have no relation to promotion to higher rank. The provision would permit promotion of persons who had never served in the grades they would be called upon to supervise. Indeed, the here questioned portion of the judgment would permit, and perhaps require, a newly recruited minority person, without fire fighter experience whatever, to be promoted to any advanced rank in the City's fire department upon passing an oral examination alone. Here also, contrary to the superior court's conclusion, we find a reasonable relation to promotion to higher rank in the rejected "time in grade requirements and seniority factor...."

But once again there is a transcendent rule. As we have pointed out, the City's criticized fire fighter employment and promotion practices violated neither Fourteenth Amendment, nor Civil Rights Act, precepts. It may well have been that as to one or more of those practices there was, at least in some degree, no reasonable job relation. But the permissible remedy was not imposition of the drastic sanctions of the judgment. In such a case, as noted in *Washington* v. *Davis, supra*, 426 U.S. 229, 252 [48 L.Ed.2d 597, 614], "Those deficiencies are to be *directly* addressed in accordance with appropriate procedures ...." (Italics added.) The superior court has the power, when reasonably required, to correct such matters in accordance with law.

It follows that the entire judgment must be reversed upon the authority of the Fourteenth Amendment and the Civil Rights Act.

Our decision today is entered without prejudice to the right of plaintiffs or any interested and proper parties to establish, if they can, that any of the City's fire department's practices have an unreasonably or unnecessarily disproportionate racial impact, or are not job related.

(We, ourselves, have found none.) In such an event the superior court will bear in mind that the purpose of the City's fire department is the protection of the lives and property of its people; it is not to furnish jobs for persons found to be unsuited for that task. If such deficiencies are found, and as long as the City shall act in good faith and without intent or purpose to discriminate on racial grounds, affirmative relief of the sort here applied by the judgment will be improper.

It is found unnecessary to our disposition of the appeals to consider certain of the state's statutes relied upon by plaintiffs, forbidding employment or other discrimination on account of race. Those statutes also lend no aid to plaintiffs; they patently would invalidate the superior court's judgment purporting to permit their proscribed racial discrimination against nonminority Caucasians. Nor need we specially consider plaintiffs' reliance on the state Constitution's "equal protection" clause found in its article I, section 7. The equal protection standards of the Fourteenth Amendment, and of the state's Constitution, are substantially the same. (See *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *Reece* v. *Alcoholic Bev. etc. Appeals Bd.* (1976) 64 Cal.App.3d 675, 679 [134 Cal.Rptr. 698].) And, of course, were there a conflict, in the context of the case at hand the Fourteenth Amendment, the supreme law of the land, would prevail.

The judgment is reversed. The superior court, and the parties or any of them, may take such further proceedings as are not inconsistent with the views we have expressed. A cross-appeal by plaintiffs from the portion of the judgment denying an award of attorney fees having become moot, it is dismissed.

Newsom, J., concurred.

RACANELLI, P. J.—I concur in the judgment for the following reasons:

Since the record is barren of any evidentiary or factual basis to support the constitutional or statutory claim of unlawful discrimination in the hiring and promotional practices of the Oakland Fire Department, no valid justification is demonstrated for the imposition of

*judicially* fashioned affirmative relief to ameliorate or dissipate the effects of *past* discriminatory practices. But while the array of federal precedents extensively discussed by the majority would generally condemn a "quota" form of relief based solely upon racial considerations, I do not understand those holdings or the majority opinion to categorically proscribe any race conscious plan or program voluntarily initiated and carefully designed to remedy or alleviate the pervasive effect of past discriminatory practices particularly in the market place of business and job opportunities.

Petitions for a rehearing were denied January 26, 1981, and the following opinion was then rendered:

**THE COURT.\***—Our opinion of January 7, 1981, is modified by adding thereto the following:

The judgment of reversal renders moot any claim of jurisdictional defect based upon grounds of nonjoinder of indispensable parties.

Nor need we determine those "injured" by this regrettably protracted litigation of seven years' standing, during which time the City's fire department has apparently been without fire fighter appointments or promotions. Additionally, there is no necessity to reconstruct the uncertain past, and fix and order restoration of the "status quo."

■ Finally, we find no uncontroverted evidence of present or recent racial discrimination because a minority member fire fighter job seeker was disqualified for inability to accomplish the required "pullups" test notwithstanding a similar inability on the part of a nonminority employee (lieutenant) of long standing. No legal requirement exists to test current employees in the same manner as new applicants are tested absent evidence of prior discrimination resulting in a denial of opportunity to qualify under less stringent standards previously in force. (*Hardy* v. *Stumpf* (1978) 21 Cal.3d 1, 10 [145 Cal.Rptr. 176, 576 P.2d 1342], see also fn. 4, p. 10.)

Claims asserted for intervention and "full standing" as parties may be renewed in any future proceedings which we may properly assume

---

\*Before Racanelli, P. J., Elkington, J., and Newsom, J.

will be conducted according to law thus rendering added "directions" unnecessary.

As our opinion is so modified, the several petitions for rehearing are denied.